## THROWER v. THE STATE.

1. At common law keeping a gaming-house was an offense, although no form of gambling was then punishable, and gaming contracts were enforced by the courts.
2. Prior to the first Penal Code this common-law offense of keeping a gaming-house was punished in Georgia.
3. The same offense is defined by the Penal Code, § 398, which makes keeping a gaming-house a misdemeanor, without reference to the character of the games there carried on.
4. Betting on a horse-race is gaming within the meaning of the code.
5. One who maintains a house for the purpose of such gaming is guilty of keeping a gaming-house, even though betting on a horse-race is not prohibited by statute, and though the race be run in a different State.
6. The statute is not aimed at the games or the players, but against keeping a house where gaming of any sort is encouraged, and because of its tendency to corrupt morals and to ruin fortunes.

Argued June 15,—Decided June 26, 1903.

Indictment for maintaining a gaming-house. Before Judge Roan. Fulton superior court. May 30, 1903.

*Arnold & Arnold*, for plaintiff in error.
*C. D. Hill, solicitor-general*, and *Rucker & Rucker*, contra.

Lamar, J. The defendant was indicted under the Penal Code, § 398 for "keeping a gaming-house," and upon the trial was found guilty. It appears that he was the proprietor of what is called a "turf exchange," at which large numbers of persons daily congregated for the purpose of betting on horse-races, run in distant States, but reported at the exchange by telegraphic dispatches. The odds against every horse in any race were posted on a blackboard in the room. While not given in detail, we understand, from

what is stated as to the method of posting, that the following would illustrate what is placed on the board:

2 to 1 against horse A.

2 to 1 against horse B.

3 to 1 against horse C.

3 to 1 against horse D.

4 to 1 against horse E.

Persons desiring to bet would select a horse, pay $1, and receive a ticket showing the sum to which he would be entitled in case that horse won. The proprietor was in effect a book-maker, and backed the field, being bound to win if he could get takers enough to make the book on each race, and could keep the amount of his heaviest odds less than the total stakes put up by the individual bettors in each race. 3 Ency. Brit. 618. The details would be changed because single " books" were not made; but the principle would be the same where money bets were made or tickets sold. In the instance above given he received $5; his heaviest loss could be only $4, and he might lose only $2. At any rate one of the witnesses lost $7,000 at this exchange, and many other smaller amounts. The evidence is that many attended, and the betting was constant, those backing the successful horse winning in each race, often heavy odds, but the greater number, of course, being bound to lose, and the exchange to gain, these gains being sure and certain if only takers enough were to be had and all the odds sold. This being an element of uncertainty against the proprietor, it was desirable to have a clearing-house or place in which to gather a crowd, and the "turf exchange" is the modern expedient to secure that result. But the plaintiff in error insists that he was not keeping a gaming-house, because no *game* was played; the races occurred in distant States; and betting on a horse-race not being itself a criminal offense, it can not be an offense to maintain a place where such betting is allowed.

The act as published in Cobb's Digest, 815, and in the Code of 1863, § 4423, is subdivided by a semicolon, and makes even clearer what is apparent upon an investigation of the statute as now published in the Penal Code, § 398. It creates three separate offenses: (1) Whoever keeps a gaming-house is guilty of a misdemeanor. (2) If he does not keep and control the house, but merely permits it to be used by other persons as a place where betting on games or

devices is carried on, he is guilty of a misdemeanor. (3) If he knowingly rents the house to be used for such purpose, he is guilty of a misdemeanor. And in section 392 it is further provided that if he keeps a house to the *encouragement* of gaming, he is guilty. Keeping a gaming-house is a separate, well-defined offense, and entirely independent of the criminality of the betting carried on therein. The statute is aimed at the place, not at the players, nor at the game, nor at the subject-matter of the wager. At common law keeping a gaming-house was an offense before any sort of game was prohibited, and was punished when gaming was not even against public policy, when the courts recognized such contracts, and by solemn judgment made the loser pay his bet. But to maintain a place for the purpose of inducing men to gather and game was a common nuisance, because of its tendency to corrupt morals and ruin fortunes. United States *v.* Dixon, 4 Cranch C. C. 107. The game might be harmless, or, if in private, only the immediate actors would be affected; but when the public were invited, when there were always present those ready and anxious to stake, when the gains of one excited others to participate, when the pride of public success stimulated the winner, and the loser attempted to hide the mortification of defeat by a bold front until the last coin was gone, the law was bound to interfere. The English rule and our own statute are both based on the recognition of the cumulative evil which may inhere in a multiplicity of acts not themselves criminal. Idleness is not a crime, but an aggregation of innocent idleness may culminate in the crime of vagrancy. Penal Code, § 453. To allow liquor to be drunk on one's premises on Sunday is not made an offense, but to keep a place where persons may congregate for that purpose is to convert the building into a tippling-house. The non-criminality of the drinking does not save the housekeeper. Penal Code, § 390. A single act of noise may be innocent, but continued too long the harmless disorder makes the owner the keeper of a disorderly house. Penal Code, § 392. Betting on a game or an event not made penal is not an offense, but to keep a house for that very purpose will ripen into a crime. Keeping a gaming-house, a tippling-house, or a disorderly house are all made offenses by the Penal Code, because, while acts done therein are not crimes, they lead to crime. Such places are hotbeds; and the maintenance thereof is prohibited in pursuance of the preventive policy of the law, in an

endeavor.to save the idle and the dissolute from themselves, and to prevent the misery and loss which wait on those who frequent such places. The wholesale gaming and the evil consequences arising from the keeping of a "turf exchange" are as great, if not greater, than those flowing from the maintenance of any other gaming place; and the proprietor can only escape the consequences by showing that his is not a gaming-house within the meaning of the statute.

The words, "wagering," "playing," "gaming," and "betting," though each having a meaning more or less different from the other, are often used one for the other. The statute in prohibiting gaming does not intend to prohibit amusement, sport, recreation, or diversion, but is aimed at the hazarding of money on certain prohibited games and devices. In prohibiting a gaming-house it is intended to prevent the maintenance of a *place* at which persons come together for the purpose of hazarding and betting money, whether the subject-matter of a single bet is or is not made penal. There is a difference between gambling and gaming. In defining gaming contracts the code refers to contracts in which money has been wagered, although there may be no sport, no skill, no element of contest between those betting; and therefore, while some few courts rule that betting on a horse-race is not even gaming, most others (14 Am. & Eng. Enc. L. (2d ed.) 682, n. 1, 2) decide it to be gaming, and our own court has held that "betting on a horse-race is gaming in the sense of the code." *Dyer* v. *Benson*, 69 *Ga*. 609. It may not be gambling, but it is gaming; and if so, a person who maintains a place where such betting is carried on as a business is keeping a gaming-house. The gaming or betting goes on therein although the race itself may be conducted elsewhere. No one will deny that the young man who lost his $7,000 could have recovered it had he sued in time under the provisions of the Civil Code, § 3671, even though it were lost in gaming on races run in New York, Saratoga, or Sheepshead. It was gaming, and gaming in this very house, and the owner was keeping a gaming-house even if betting on a horse-race is not itself punished under the Penal Code. To the decisions cited by counsel may be added that of *State* v. *Corporation of Savannah*, *T. U. P. C.* 238, decided in 1809, from which it appears that, long before our first Penal Code, "keeping a gaming-house" was recog-

nized as "a nuisance and an offense against the public police, and a part of that law which our ancestors brought from England, and not impaired by our fundamental laws." It is true that since 1833 we have had only statutory offenses. *White* v. *State*, 51 *Ga.* 288. But where the common-law crime has been adopted, and common-law terms used in its definition, the construction previously placed thereon by the English courts becomes by intendment a part of the adopting statute. Pol. Code, §§ 1, 4 (9). It would seem clear, therefore, that when the legislature, in concise but comprehensive language, declared that "keeping a gaming-house is a misdemeanor," it had in mind the English law on the same subject, under which the crime was committed when the house was kept for the purpose of gaming, regardless of the criminality or character of game, wagering, or betting carried on therein.

The conviction is amply sustained under the language of our code, and the common-law authorities thus incorporated into our law. The rulings in other States, we think, all tend to support the same conclusion. The statutes were different in some respects, but the reasoning of the courts on facts almost identical to those at bar is strongly in point. "If the room is one whose use is intended to facilitate gaming operations, and where sporting characters are invited to congregate for purposes of illegal amusement or gain, and to stake money upon trials of chance, skill, or endurance, we seem to have everything necessary to constitute a gaming-room. That some or all of the games or trials are innocent is of no importance." Citing Clayton v. Jennings, 2 W. Bl. 706. "It is not necessary that persons be present at the place of game or contest that they may participate in the mischiefs of gaming. . . Nothing seems more unimportant than that the gaming— the part that in itself is innocent, and which only furnishes the occasion, and gives opportunity for the criminality — is at a distance." People v. Weithoff, 51 Mich. 203. The purpose of the Florida statute was like ours, and to "prohibit, not the gaming itself, but the keeping of a house for any manner of gaming. If a house is kept for the purpose of having money bet therein upon any result or event whatsoever, such house falls within the inhibition of the statute, whether the means adopted for the decision of the question as to who is the winner or loser of the thing wagered be prohibited by law or not." McBride v. State, 39 Fla. 442, where the facts were almost similar to those

at bar, and where the court says that its conclusion is supported by the following cases exactly similar in their facts : Swigart *v.* State, 154 Ill. 284; People *v.* Weithoff, 93 Mich. 631.    It is unnecessary to quote further, but see Bollinger *v.* Com., 98 Ky. 574 ; State *v.* Stripling, 113 Ala. 120 ; Com. *v.* Moody, 143 Mass. 137; Kneffler *v.* Com., 94 Ky. 359.    James *v.* State, 53 Md. 242, which is contra, was not only by a divided court, but the majority failed to unite in the same opinion, and the dissents by Chief Justice Alvey and Miller, J., vigorously and forcibly sustain the position taken by the cases above cited.    State *v.* Shaw, 39 Minn. 155, determined that the blackboard scheme was not a gambling device, but also decided that the keepers of a pool-room could have been indicted at common law for keeping a gaming-house.    The fact that the proprietor not only kept the house but took part in the betting does not lessen his responsibility as keeper.    He has not been prosecuted for the betting itself, but by becoming a party to the wager he did not relieve himself from punishment for maintaining the house.

Plaintiff in error, however, relies on the case of *Odell* v. *Atlanta*, 97 *Ga.* 670, where the proprietor of a "turf exchange" had procured a license to do "business on commission," and, before the expiration of the year for which he had paid, the city council of Atlanta attempted to prevent him from exercising the privilege which he claimed was conferred by the payment of the tax.    This court held that the license was not a contract ; that there was no State statute making such "occupation" or "business" penal, and that, being contrary to public policy, the city could by municipal ordinance prevent such a business from being carried on within its limits.    But the ruling of the court must be confined to what it said.    It was dealing with the legality of the "business" and "occupation," and of the power of the city to prevent the continuance of such "business."    The city had the right to break it up, whether the book-making was in a house, or whether the bookmaker made his book on the streets, or by hunting up bettors in their own residences.    Whether the proprietor was guilty of keeping a gaming-house within the meaning of Penal Code, § 398, was not discussed by the court, nor is anything which was said as to a "business" conclusive in a different proceeding by the State, prosecuting the proprietor of such a place for "keeping a gaming-house."

*Judgment affirmed.    All the Justices concur.*