[No. 8978.  Department Two.  November 26, 1910.]

## CECIL THORNTON, *by his Guardian ad litem Frank Thornton, Respondent,* v. MATTHEW DOW *et al., Appellants.*[1]

APPEAL — REVIEW — HARMLESS ERROR— ERRONEOUS INSTRUCTIONS. CURED BY VERDICT. The failure of a jury to follow, in making a special finding, an erroneous instruction of the court is not prejudicial error, where the record upon the whole case shows that the verdict was right, and no other verdict could have been rendered on proper instructions.

TRIAL—FINDINGS—CONSTRUCTION—NUISANCES.  A finding that a railing around a balcony in a public building was a nuisance at the time of the accident, at which time a great crowd was pressing upon it, has the effect of finding that it was a nuisance at the time it was completed, it being in the same condition at both times.

NUISANCES—DEFINITIONS.  The general definition of "nuisance" is comprehensive enough to include almost all wrongs interfering in any way with personal rights of every kind.

NUISANCES—CLASSIFICATION—BUILDING.  An insufficient balcony rail in a public building does not belong to the class of nuisances embraced within things of a noxious or dangerous kind or dangerous within itself.

[1]Reported in 111 Pac. 899.

NUISANCE—INSUFFICIENT STRUCTURE—LIABILITY OF CONTRACTOR TO PUBLIC—CAUSAL CONNECTION. There is no causal connection between a spectator at a public entertainment, injured by the giving way of a balcony rail, and the contractor who constructed the railing, which could render the contractor liable for the creation of a nuisance; especially where the contractor was free from negligence and constructed the rail according to plans and specifications.

NEGLIGENCE—INSUFFICIENT STRUCTURE—CONTRACTORS—LIABILITY TO PUBLIC. A contractor, constructing a balcony railing without plans and specifications therefor, which the contract gave him the right to demand, is not therefore liable for an insufficiency in the railing, where the work was done upon consultation with, and under the direction of, the architect, and the architect testified that the building was completed in every respect according to the specifications.

SAME—ACCEPTANCE BY OWNER—NUISANCE. A contractor is not liable as for a nuisance for insufficiency in a balcony rail, where he has lived up to the "law of the building," and has not been guilty of negligence, and the building has been accepted and taken over by the owner for use.

NEGLIGENCE—INSUFFICIENT STRUCTURES—LIABILITY OF CONTRACTOR—ACCEPTANCE BY OWNER. Technical omissions in the acceptance of a state armory from the contractor will not render the contractor liable for an injury to a spectator in the building, on the ground of illegality in the manner of acceptance, where the building had been passed upon and received by the proper official and was in the possession of the state, and was leased for a public entertainment, the injured party being present at the invitation of the state or its lessee.

APPEAL—DECISION—REMAND. Upon reversing an order granting a new trial on one specified ground, without passing upon other grounds, the case will be remanded with directions to pass upon the other grounds of the motion.

Appeal from an order of the superior court for King county, Robert H. Lindsay, Esq., judge *pro tempore*, entered April 7, 1910, granting a new trial, after a special verdict of a jury rendered in favor of the defendants, in an action for personal injuries sustained by a spectator through the negligence of a contractor in constructing a public building. Reversed.

*Shank & Smith*, for appellants, contended, among other things, that the party injured must look to the person inviting him, namely the tenant. *Whitmore v. Orono Pulp &*

*Paper Co.*, 91 Me. 297, 39 Atl. 1032, 64 Am. St. 229, 40 L. R. A. 377; *Johnson v. Tacoma Cedar Lumber Co.*, 3 Wash. 722, 29 Pac. 451; *Ward v. Hinkleman*, 37 Wash. 375, 79 Pac. 956; *Baker v. Moeller,* 52 Wash. 605, 101 Pac. 231. A contractor is liable only for his own negligence or improper construction prior to completion and acceptance. Cooley, Torts (1st ed.), 548; 16 Am. & Eng. Ency. Law (2d ed.), 209; 6 Cyc. 60-62; *Pearson v. Zable,* 78 Ky. 170; *Lawrence v. Shipman,* 39 Conn. 586; *Church of the Holy Communion v. Paterson Extension R. Co.,* 68 N. J. L. 399, 53 Atl. 449; *Board of Comr's of Cloud County v. Vickers,* 62 Kan. 25, 61 Pac. 391; *Pye v. Faxon,* 156 Mass. 471, 31 N. E. 640; *Laycock v. Parker,* 103 Wis. 161, 79 N. W. 327; *Boswell v. Laird,* 8 Cal. 469, 68 Am. Dec. 345; *Lancaster v. Connecticut Mut. Life Ins. Co.,* 92 Mo. 460, 5 S. W. 23, 1 Am. St. 739; *Wilkinson v. Detroit Steel & Spring Works,* 73 Mich. 405, 41 N. W. 490; *First Presbyterian Congregation v. Smith,* 163 Pa. 561, 30 Atl. 279, 43 Am. St. 808, 26 L. R. A. 504; *City of Louisville v. Shanahan,* 22 Ky. Law 163, 56 S. W. 808; *Marvin Safe Co. v. Ward,* 46 N. J. L. 19; *Meier v. Morgan,* 82 Wis. 289, 52 N. W. 174, 33 Am. St. 39; *Morgan v. Bowman,* 22 Mo. 538; *Horner v. Nicholson,* 56 Mo. 220. After a contractor has completed his contract, and the owner has accepted possession of the building, the owner assumes to the public and to third parties the responsibility for any injuries which result from the use or occupancy of the building or structure, whether due to the contractor's negligence, or to imperfect plans and specifications, and the contractor is not liable to any one. 16 Am. & Eng. Ency. Law (2d ed.), 209; 6 Cyc. 60-62; *Curtin v. Somerset,* 140 Pa. St. 70, 21 Atl. 244, 23 Am. St. 220, 12 L. R. A. 322; *Albany v. Cunliff*, 2 Coms. (N. Y.) 165; *Daugherty v. Herzog,* 145 Ind. 255, 44 N. E. 457, 57 Am. St. 204, 32 L. R. A. 837; *Salliotte v. King Bridge Co.,* 122 Fed. 378; *Galbraith v. Illinois Steel Co.,* 133 Fed. 485; *McCaffrey v. Mossberg & Granville Mfg. Co.,* 23 R. I. 381, 50 Atl. 651, 91 Am. St. 637, 55 L. R. A. 822;

*Fanjoy v. Seales*, 29 Cal. 244; Wharton, Law of Negligence
(2d ed.), 439; *Losee v. Clute*, 51 N. Y. 494, 10 Am. Rep.
638; *Washington Bridge Co. v. Land & River Imp. Co.*, 12
Wash. 272, 40 Pac. 982.   Before a person can be held liable
for negligence as to the condition of a building he must be
either the owner of the building or have jurisdiction and con-
trol over the condition which causes the injuries.   21 Am. &
Eng. Ency. Law (2d ed.), 467; *Collier v. Great Northern R.
Co.*, 40 Wash. 639, 82 Pac. 935; *Knottnerus v. North Park
St. R. Co.*, 93 Mich. 348, 53 N. W. 529, 17 L. R. A. 726;
*Long v. John Stephenson Co.*, 73 N. J. L. 186, 63 Atl. 910.

*Reynolds, Ballinger & Hutson*, for respondent.

DUNBAR, J.—This is an action for personal injuries sus-
tained by the plaintiff, against the defendants as contractors,
who built the present state armory building for the state of
Washington, in the city of Seattle.   The plaintiff alleged
negligence in the construction of a balcony railing, con-
structed in such a way as to render the same dangerous; that
it was dangerous, and that by reason of its frailty the plain-
tiff and others, while witnessing an athletic meet, were pre-
cipitated over the balcony railing and were injured.   The
defense was, that the building was constructed in accordance
with the plans and specifications; that prior to the date of
the accident (which was May 6, 1909) the building had been
turned over to the state through its agents; that the state
had taken absolute possession of the building, and that the
defendants had nothing whatever to do with giving or per-
mitting the athletic entertainment at which the accident oc-
curred.   These were, in substance, the issues presented.

The case was tried by a jury, who returned a verdict in
favor of defendants.   A motion for a new trial was inter-
posed, and was granted because, in the opinion of the court,
the jury had disobeyed the instructions of the court in this:

40—60 WASH.

The court defined a nuisance to the jury, and instructed the jury that, if they found that this structure was a nuisance from the beginning, the question of occupancy cut no figure in the case, and that the defendants would be liable as the creators of such nuisance; and in order to make this effective, the following question was propounded to the jury for answer:

"At the time of the occurrence of the accident in question in this case, was the railing around the balcony in the drill hall of the armory, and particularly was that part of the railing on the east side of the drill hall, a nuisance within the definition of a nuisance as contained in the instruction of the court?"

The jury answered this question in the affirmative, but also found for the defendants. Deeming this a refusal on the part of the jury to follow the instructions of the court, the motion for a new trial was sustained; and from the granting of such motion this appeal is taken.

It is the contention of the respondent that, inasmuch as the special verdict should control the general finding, and the general finding is inconsistent with the special verdict, the general finding was properly set aside; and that it is not within the province of this court to enter into an investigation of the correctness or incorrectness of the instructions given by the court to the jury, for the reason that the instructions, whether right or wrong, were the law of the case.

Counsel for respondent rely upon the case of *Pepperall v. City Park Transit Co.*, 15 Wash. 176, 45 Pac. 743, 46 Pac. 407, where, it must be confessed, this question was decided by this court in favor of such contention, and the doctrine announced that, although an instruction to the jury may have been wrongfully given, it was binding and conclusive upon the jury. This case was decided by a divided court, three judges concurring and two dissenting, and the case has been endorsed, in a measure, two or three times since. But it may not be amiss to say that it has been followed with some reluctance, and that this court, as since constituted, has not

been satisfied with the rule there announced in its fullest application. In that opinion several cases were discussed by the court which undoubtedly sustain the conclusion reached, but there are other cases which hold to the contrary view; and it must conclusively appear that such a doctrine as this is opposed to the well-established rule, announced by this and other courts, that, when it affirmatively appears that an error is not prejudicial and could not have affected the result which was reached and which ought to have been reached, the commission of such an error would not warrant a reversal of the judgment. In this case, if this judgment should be reversed because the jury did not follow the erroneous instruction on the part of the court, and the case should be sent back for a retrial for that reason, the court being instructed to remedy the error by giving a proper instruction, and the case should be tried again and the same verdict rendered under such proper instruction, what benefit would accrue to either of the parties litigant? It is true that it is the duty of the judge under the provisions of the constitution and statutes to declare the law, but this is on the theory and on the supposition that the law will be declared correctly. While inconveniences may arise by reason of the failure of the jury to implicitly follow the instructions as given by the court, if it can be clearly seen that such instructions were wrong, and that a case would have to be reversed by this court if the jury had obeyed such instructions, thereby depriving the litigant of a legal right, it would seem idle to put him to the expense of another trial to obtain a right which he had lost without any fault of his own.

In *Thornburgh v. Mastin*, 93 N. C. 258, it was held that, when a jury correctly decides a question of law, incorrectly left to them by the court, the verdict cures the error. That is exactly the proposition here. If the jury had followed the erroneous instruction of the court, on appeal this court would have cured the error by a reversal of the judgment. But it would have necessitated a circuity of action and addi-

tional expenses; and if we find, in the investigation of the case here, that the instruction was erroneous, but that it was not prejudicial because the jury cured it, it seems to us that this is the short and sensible way out of the difficulty, and is in accordance with the trend of modern authority generally, to the effect that a judgment will not be reversed if it conclusively appears that it was not prejudicial in its results. In Thompson on Trials, § 1020, it is said:

"If the judge submits a question of law to the jury and they decide it rightly, there is no ground of exception; since it would be absurd to reverse a judgment in order that the judge might decide what the jury rightly decided."

It is manifest that it would be just as absurd to reverse a judgment in order that the jury might bring in the same verdict under a different instruction. This is attaching more importance to the machinery of the law than to the law itself, and imposing unnecessary costs and delays upon litigants who are confessedly entitled to the judgments which are rendered. A judgment will not be reversed for intermediate errors, when the record upon the whole case shows it to be right on its merits. *Whitworth v. Ballard,* 56 Ind. 279.

It has been the uniform holding of this court that, where the whole record shows that no other judgment than the one that was rendered could properly be rendered, errors occurring during the trial become immaterial. A common instance is where a court renders a decision on some particular ground which is not tenable. In such case it has always been determined by this court that, if the judgment could be maintained on any ground, the reason assigned for the judgment or ruling would be immaterial. As was said in the case of *Kane v. Dawson,* 52 Wash. 411, 100 Pac. 837:

"The question before us is not whether the lower court arrived at a correct conclusion by an incorrect process of reasoning, but whether, considering all the evidence, its decision was the proper one to be entered;"

the object of courts, and especially of appellate courts, being

to see that the litigants have obtained their legal rights, which in a broad sense means, not a right to every intermediate order or ruling which may occur in the trial of the cause, but an ultimate right to which they are entitled under the facts and the actual law in the case. In consideration of these views, we are constrained to overrule the case of *Pepperall v. City Park Transit Co.*, *supra*, and to hold in conformity with the general principles announced by this court that, where we find that the verdict of the jury is sustained by the law, the verdict cures the erroneous instruction, and the judgment will not be reversed.

This conclusion renders it necessary, then, to enter into a determination of the question whether the instructions of the court were right; and in order to do this, we must consider the nature of the structure, and the nature of the employment of the appellants. The Laws of 1907, p. 83, chapter 55 (Rem. & Bal. Code, § 3896 *et seq.*), make an appropriation and provide for the erection of a state armory building, for the use of the national guard in the city of Seattle; provide for a commission, of which the adjutant general and others shall be members; that the commission shall choose a suitable site for the armory building, shall obtain proper architectural design and plan and specifications and details in conformity with such plan and design, and secure the erection and completion of such armory building, conforming faithfully to such plan and design.

The contract for this building was let to the appellants. A meeting was held on the 16th of April, 1909, and an inspection of the building was made, after which, on motion, the armory building was accepted by the state, and final payment allowed. Some minor corrections were suggested, and were made before the casualty which was the cause of this accident. The final certificate of the architect was issued, and entire and complete possession was taken by the state on April 16, and it has since kept exclusive and absolute control.

General Lamping, as Adjutant General, after taking pos-

session of the building and before the falling of the railing, let independent contracts for lockers and for other minor particulars which were not included in the contract. He thereafter rented the armory building on one occasion to the May Festival, for a public entertainment, receiving substantial payment therefor, to wit, $400. He rented the armory building to the Seattle Athletic Association for the athletic entertainment which was the occasion of the accident, receiving $200 therefor. He has continued to rent the armory building, receiving all told the sum of $2,800 therefor, which money has gone into the treasury of the state.

The drill hall in which the entertainment was held is two hundred feet long, by one hundred feet wide, and the railing goes around the entire balcony, which is ten or twelve feet high, the balcony containing three rows of seats around its entire length. As bearing upon the question of whether this construction was a nuisance *per se*, or such a nuisance as might be said to be dangerous within itself and which would reasonably be brought to the knowledge of the contractor as a nuisance *per se*, it becomes necessary to notice somewhat the manner in which this accident occurred.

On the evening on which this athletic association held its entertainment, there were different classes of entertainment, but the culminating feature was a ten-mile Marathon race. In this race four or five laps were run in the armory building, and then the course went into the open air around Lake Union, and back into the armory building for the closing laps. The contestants, coming back earlier than was expected, collided with a relay race which was in progress, and the leaders fell in a heap, which incident was somewhat exciting to the crowd. One of the leaders was a Seattle boy and the other was a Portland boy. The race was very close and was run in what might be termed, in race-horse parlance, "neck and neck," the Seattle boy being put forward by the Seattle club and the Portland boy being backed by the Portland club. According to the testimony, there was intense rivalry between the two

clubs. The testimony shows that the wildest excitement prevailed at the finish of this contest, bringing vividly to mind the celebrated contest between Messala, the Roman, and Ben Hur, the Jew, so graphically described by General Lew Wallace. According to the testimony, after the men had left the armory and were completing their course, at various points word would be sent to the audience concerning their respective positions, and when the men finally on their return entered neck and neck, the excitement was at fever heat, the witness stating that it was the most exciting contest he had ever witnessed, and that he had witnessed a great many. His language is as follows:

"These men circled the hall five times, running neck and neck all the time, and the crowd was getting wilder naturally, with enthusiasm, at each circle of the hall; so at the very final —at the final dash, about fifty yards I should judge, straight away to the finish, these two men, just inches apart, the enthusiasm of the crowd broke over all bounds and they not only came down from—some of them came down from where they had been standing back under the balcony and they rushed clear across from the other side of the hall, and even people who were on the opposite side upon the balcony rushed—came down stairs all at once to see the finish of this very exciting race, so that they came rushing in from both sides of this narrow lane where the runners were to finish, and they rushing in from behind, that is, from the outside, on the floor, not under the balcony. The judges were stationed—one judge on the inside of the track, that is, under the balcony, and two of us on the other side, and several timers and a number of officials were there. And they rushed in and pressed this finish line back under the balcony; that is to say, in the finish the runners had to run closer under the balcony than they would on the lines originally laid out by the men who laid off the track, and it was necessary for several of us—we tried to hold the crowd back by forming a line with our hands, several gentlemen on this side of me and several on that side of me, we tried to hold them back, but it was impossible, they broke right through our arms—our locked hands—and swept over the floor. At the finish of the race—it was just about five or six yards from the finish, the men were, when this accident oc-

curred, they were within five or six yards of the finish, and the forcing of this finish line under the balcony upset all the plans to have the finish out in full sight so that the people upstairs in the back rows of the balcony were unable to see the finish and rushed down to get to the front of the balcony, and I first noticed it on the last lap, as the men were coming around the last turn, when I saw the people in the front row of the balcony beginning to lean over the railing and a great many of them with their hats in their hands I mean particularly, leaning over there and shouting to the runners, waving their hats and yelling, so that many of them were bent very far over the balcony with the railing about across the middle of their bodies and most of their weight on the outside, and people behind them were rushing down, jumping over the seats and everything else to get a view of these runners who were right down below them, and the next thing I saw was the—mentioned to several people that the crowd was the wildest I had even seen in an event of that kind—and the next thing I noticed was this wave of people just falling over the edge of the balcony."

There was some testimony tending to show that the railing would not resist very much of a strain; but the jury had this question before them, and evidently concluded that the strain was very great and unprecedented, and that the contractors were not responsible for this extraordinary strain. The answer of the jury to the special interrogatory was to the effect that, at the time of the occurrence of the accident in question, the railing around the balcony consituted a nuisance. It is the contention of the appellants that this is not a finding that the railing around the balcony was a nuisance at the time the building was completed and turned over to the state. But we think this would be too narrow a construction to place upon this finding, as there is nothing in the testimony to show that the railing was in any different condition at the time of the accident than it was at the time it was completed. In fact, it appears pretty conclusively from the testimony that it was in the same condition.

So that it becomes necessary to determine whether the instruction given by the court, to the effect that if the jury

found that the railing was a nuisance the defendants would be responsible, was erroneous. We think, under the great weight of authority, that it was. The word "nuisance" is so comprehensive that it has been applied to almost all wrongs which have interfered with the rights of the citizen, either in person, property, the enjoyment of his property, or his comfort, and is defined as, "anything that worketh hurt, inconvenience, or damage." *Veazie v. Dwinel*, 50 Me. 479, citing 3 Black. Com. 116. It is also defined as, "anything that unlawfully worketh hurt, inconvenience or damage." *People v. Metropolitan Tel. & Tel. Co.*, 11 Abbott's New Cases, 304. Russell, in his treatise on Crimes, said: " 'Nuisance' signifieth anything that worketh inconvenience." "Whatever unlawfully annoys or does damage to another is a nuisance." *United States v. Douglas-Willan Sartoris Co.*, 3 Wyo. 287, 22 Pac. 92. "A 'nuisance', as ordinarily understood, is that which is offensive and annoys and disturbs." *Bohan v. Port Jervis Gas Light Co.*, 122 N. Y. 18, 25 N. E. 246, 9 L. R. A. 711. "A 'nuisance' is that which disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable." *Baltimore & P. R. Co. v. Fifth Baptist Church*, 108 U. S. 317. "The term 'nuisance', derived from the French word 'nuire' to do hurt or annoy, is applied in the English law indiscriminately to infringements upon the enjoyment of proprietary and personal rights." Addison on Torts, 155. There are very many other definitions of the word or term 'nuisance' which, in effect, spread it over almost every injury that is done by one person to another; but we have cited enough to show the general idea of the term nuisance.

Now, it is earnestly contended by the respondent that the general rule is that all parties to a nuisance, he who creates it and he who maintains it, are responsible for its effect without limitation of condition or of time; and this is undoubtedly true as to a certain class of nuisances—what are termed nuisances *per se*. But in order to intelligently consider these

general announcements in regard to the responsibility of parties to a nuisance, whether of owners or builders or lessors or lessees or contractors, the term and the responsibility must be classified, or an investigation, however extensive it may be, results only in confusion. This classification is intelligently set forth in *McCaffrey v. Mossberg & G. Mfg. Co.*, 23 R. I. 381, 50 Atl. 651, 91 Am. St. 637, 55 L. R. A. 822, where it was held that the manufacturer of a drop press was not liable to a purchaser's employee for injuries caused by the breaking of a defective hook holding a heavy weight, the cause of the injury not being in its nature imminently dangerous, and there being no fraud or concealment or implied invitation to the employee to use the machine. The court in that case said:

"Cases which involve the liability of a defendant to those with whom he does not stand in privity of contract may be grouped into three classes: (1) Where the thing causing the injury is of a noxious or dangerous kind; (2) where the defendant has been guilty of fraud or deceit in passing off the thing; (3) where the defendant has been negligent in some respect with reference to the sale or construction of a thing not imminently dangerous. The principle that governs the first class of cases is that one who deals with an imminently dangerous article owes a public duty to all to whom it may come, and whose lives may be endangered thereby, to exercise caution adequate to the peril involved."

This principle has been applied in many cases to the sale of poisonous drugs under a false label, where dangerous naphtha was sold, where laudanum was sold for rhubarb, and in general where the action was in relation to the things that were inherently dangerous, as where the air which people breathe is poisoned or polluted with noxious vapors, where vicious animals are allowed to run at large, and where deadly missiles are thrown into a gathering or crowd of people. Said the court in that case:

"A similar principle governs the second class of cases, in which the degree of danger in the thing itself may be less, but

where the seller actually knows of the danger in the article and puts it forth by some fraud or deceit. In such cases the breach of duty grows out of the fraud or deceit in the sale, and it extends to persons injured thereby, who may reasonably be deemed to be within the contemplation of the parties to the transaction."

And instances are given by the court of this character of nuisances. It will be seen that this case does not fall within either of these classes. The thing built or constructed here —the armory—of course, was not of a noxious or dangerous kind, and nothing noxious emanated from it; and within itself it could not be said to be dangerous. The danger would depend entirely upon the use to which it was put. The third class of cases, said the court in the case we have just been reviewing, relating to the sale of a thing not in its nature dangerous, rest upon the principle that in such thing there is no general or public duty, but only a duty which arises from contract out of which no duty arises to strangers to the contract. It will be seen in this case that there was a contractual relation between the builders—the owners of the armory and the contractors, which ended with those two parties. The principle governing this sort of a transaction is treated of by Cooley on Torts (2d ed.), 672, where the author appropriately remarks:

"An attempt to classify nuisances is, therefore, almost equivalent to an attempt to classify the infinite variety of ways in which one may be annoyed or impeded in the enjoyment of his rights. It is very seldom, indeed, that a definition of a nuisance has been attempted, for the reason that, to make it sufficiently comprehensive, it is necessary to make it so general that it is likely to define nothing."

It is also treated of by Wharton in his Law of Negligence (2d ed.), § 438, et seq., and he bases the liability on the law of contract and of what he terms "causal connection," as will be seen from the following excerpt:

"Thus a contractor is employed by a city to build a bridge in a workmanlike manner; and after he has finished his work,

and it has been accepted by the city, a traveler is hurt when passing over it by a defect caused by the contractor's negligence. Now the contractor may be liable on his contract to the city for his negligence, but he is not liable to the traveler in an action on the case for damages. The reason sometimes given to sustain such a conclusion is, that otherwise there would be no end to suits. But a better ground is that there is no causal connection, as we have seen, between the traveler's hurt and the contractor's negligence. The traveler reposed no confidence on the contractor, nor did the contractor accept any confidence from the traveler. The traveler, no doubt, reposed confidence on the city that it would have its bridges and highways in good order; but between the contractor and the traveler intervened the city, an independent responsible agent, breaking the causal connection."

Many cases are cited which seem to be squarely in point sustaining the text. It will be seen, however, that this is a stronger case against the respondent's contention than the case at bar; because, in the instance given by the learned author, the accident was caused by the contractor's negligence; while in the case at bar, if the contractors are to be held liable under the testimony, they are liable because they carried into effect the plans and specifications which were furnished them by the owner.

There is an attempt by the respondent to establish the fact that there was no specification as to the manner in which the railing should be attached; and that, inasmuch as there was a provision in the contract for an application to the architect to furnish specifications when any were omitted, and as no written application had been applied for, the contractors themselves became responsible for the manner in which the railing was fastened to the building. But the overwhelming and undisputed testimony is that, while no written application was made to the architect, he was there, looking over the work and seeing how the work in every particular was done; and it must be reasonably concluded that this part of the work, as well as all the rest, was done by consultation with, or by at least the consent and direction of, the architect. The

testimony of the architect, as to the building being completed
in every respect according to the specifications, is so direct
and positive that there can be no question raised about it. It
would be a hard and impracticable rule to announce that a
man who had performed his duty under the contract should
be held responsible for the sufficiency and correctness not of
the work which he performed, but of the plans which are fur-
nished him to be carried into execution. It may readily be
conceived that a carpenter or builder may have the mechanical
knowledge and skill to erect a building or structure of any
kind, when he would in no way be competent to determine its
safety or whether it would meet the requirements of its con-
struction. Frequently such questions would have to be de-
termined by skillful and learned engineers. In the case of
building bridges, the resisting or sustaining power of ma-
terial would have to be scientifically determined; and it would
be a strange law indeed that, under such circumstances, the
mechanic would be held responsible for a mistake in a calcu-
lation of this kind. The result would be, either that con-
tractors would refuse to erect structures, or that, in order
to make themselves safe, they would charge such prices as
would be prohibitive.

In reviewing the many cases that have been cited to us, and
which we have been able to find through our own research,
there has entered into nearly all of them, where the contractor
has been held liable, the element of negligence or of violation
of contract. The respondent cites the following from Wood
on Nuisances, vol. 2 (3d ed), § 703, under the heading, "Per-
sonal injury always actionable when person injured is free
from fault:"

"It should perhaps be stated that for personal injuries
sustained by a person by reason of any nuisance in a high-
way, of injuries thereby inflicted upon his team or property,
the person creating the nuisance, as well as the person main-
taining it, is always liable in a civil action, if the person in-
jured was in the exercise of ordinary care when the injury was
inflicted, and no degree of care on the part of the person erect-

ing or maintaining the nuisance will exempt him from liability. The act is a wrongful one, and he is answerable for all the consequences that flow therefrom, to a person who is not chargeable with negligence by reason of which the injury is inflicted;"

citing to sustain the text, *Jones v. Chantry*, 4 T. &. C. (N. Y.) 63, and *Chicago v. Robbins*, 2 Black (U. S.) 418. In *Jones v. Chantry*, the defendant placed wagons in a highway, and the plaintiff, in turning to avoid collision with the wagons, ran upon a heap of sand which had been hauled there by the defendant, and was thrown out of his wagon and injured. It was held that the defendant, having directed where the sand should be deposited, was not exempted from liability for the injury caused by it because the person who placed it there was a contractor for the erection of the building in which it was to be used. It will be seen that this was the ordinary case of damages for obstruction in the street, which was directed to be placed there by the defendant in the case, and in no way bears upon the text announced by the author above quoted. In *Chicago v. Robbins*, so far as the question under discussion by the learned author was concerned, it was simply held that, if a nuisance necessarily occurs in the ordinary mode of doing work, the occupant or owner is liable; but if it happens by the negligence of the contractor or his servants, the contractor alone is liable. That, too, is the universal doctrine in relation to the liability of independent contractors, and in no way bears upon the subject under discussion, where, as we have seen, this case must be dealt with on the theory that there was no independent negligence on the part of the contractors.

In *Galbraith v. Illinois Steel Co.*, 133 Fed. 485, 2 L. R. A. (N. S.) 799, it was held, where the owner of a building contracted with the company to install a sprinkler system according to plans and specifications, and the company contracted with the defendant for the construction of the support, but in the actual construction a tie member specified in the plans was omitted by the defendant, and by reason of such

omission the support afterwards collapsed and damaged the plaintiff, the plaintiff could not maintain an action in tort to recover such loss from defendant, whose duty was measured by the requirements of the contract and was enforcible only by the other party to the contract; the court basing its opinion on the doctrine, announced above by Wharton, that there was no contractual connection between the defendant and the plaintiff.    Judge Grosscup dissented in that case—not upon the theory contended for by the appellants in this case, but upon the theory of contractual responsibility.

"The modern structure," said the judge, "is the work of many trades.   To safely erect such structure, plans and specifications covering the whole, by competent architects, are not simply a convenience—they are a necessity.   Through such plans and specifications alone, can the work of the many trades be co-ordinated.   Through them alone, in the midst of diversity can the owner build to a given end.   Plans and specifications, therefore, are essentially the Law of the Building. They are in practical effect, the owner's direction to the contractors—not simply to the immediate contractor, but to all who take contracts subservient thereto, a direction that each contractor by taking his contract in reality accepts; and safety and good faith demand not simply that contractors should perform their contracts with each other, but that each contractor, by living up to the Law of the Building, should obey the direction thus given and accepted, and thus perform his duty to the owner—indeed, to all who may, in person or property, be directly affected by the buildings being erected in accordance with the plans and specifications."

The term "law of the building," is a happy and forceful expression, and is particularly pertinent to the facts of this case.   No higher duty, it seems to us, can be demanded of the ordinary contractor in building structures of this kind, than to live up to the law of the contract or the law of the building. In *First Presbyterian Congregation v. Smith*, 163 Pa. 561, 30 Atl. 279, 43 Am. St. 808, 26 L. R. A. 504, it was held, not only that a contractor was not liable, but that the negligence of a contractor in building a sewer for a city would not

render him liable to the owner of private property which was injured by the breaking of the sewer, after the completion of the work and its acceptance and use by the city. This case goes beyond the defense in relation to following the specifications, but also reaches the other defense that the property had been turned over to the owner and that the contractor was no longer responsible for it. In this case the class of cases which may be termed nuisances *per se* were noticed and distinguished from the case under consideration. It announces its allegiance to the rule of causal connection put forth by Mr. Wharton as above cited, and reaffirmed the doctrine of *Curtin v. Somerset,* 140 Pa. St. 70, 21 Atl. 244, 23 Am. St. 220, 12 L. R. A. 322, which is severely criticized by learned counsel in this case.

In *Curtin v. Somerset,* it was held that, in order that a person who had been injured by an accident may hold another liable therefor upon the ground of negligence, there must be a causal connection between the negligence and the hurt; and that such casual connection must be uninterrupted by interposition between the negligence and the hurt of any independent human agency. It was there held that a contractor for the erection of a hotel building, who used improper material in its construction and in other respects departed from the specifications embodied in his contract, so that the building when completed was structurally weak and unsafe, would not be liable to a guest of the hotel for an injury caused to him by such defective construction occurring after the owner had taken possession. That case was distinguished from *Thomas v. Winchester,* 6 N. Y. 397, 57 Am. Dec. 455, where the court held a dealer in drugs and medicines, who carelessly labeled a deadly poison as a harmless medicine and sent it so labeled into market, was liable to any one who was injured without any fault on his part; holding that there was no analogy between that class of cases and the one under consideration. It is intimated by learned counsel for respondent that this case stands alone and ought to receive the condemnation of

other courts, but from our investigation it seems to us that it is well sustained by authority, and omitting that portion of the case which bears upon the liability of a negligent contractor, meets with our endorsement.

In *Lancaster v. Connecticut Mut. Life Ins. Co.*, 92 Mo. 460, 5 S. W. 23, 1 Am. St. 739, the distinction was made between a case where the negligence which produced the injury was in the workmanship or materials to be furnished by the contracts, and one where the negligence was in the plans and specifications; and held that in the latter case the defendant would be relieved from liability. This case, we think, is in harmony with the great weight of authority and with right reasoning.

In *Mayor etc. of Albany v. Cunliff*, 2 Coms. (N. Y.) 165, it was held that the mere architect or builder of a public work was answerable only to his employers for any want of care and skill in the execution thereof, and that he was not liable to third persons for accidents or injuries which might occur after the completion of such work; a much stronger case than the one under consideration. The court, in the course of its remarks in that case, at page 174, said:

"But the bridge was completed, and had been in the charge of pier owners, more than three years before it fell and injured the plaintiff. In such a case, there is neither precedent nor principle for allowing a third person to turn from those who are bound to maintain the bridge, and bring an action against the architect or builder. He is only answerable to those for whom he builds."

The court added:

"He is not answerable to them, if he builds according to his contract or duty, however frail the structure may be. But the owner, on whom the duty of maintaining rests, is answerable to third persons for the sufficiency of the work, whether he has been injured by the builder or not."

The court then proceeds to the statement that a party who has erected a nuisance will sometimes be answerable for its

continuance after he has parted with the possession of the land, but that it is only where he continued to derive a benefit from the nuisance; citing different cases to that effect. But even in those cases it was an erection of a nuisance by the owner or director that was spoken of.

In *Daugherty v. Herzog*, 145 Ind. 255, 44 N. E. 457, 57 Am. St. 204, 32 L. R. A. 837, it was held that the negligence of a contractor in reconstructing a building would not render him liable to a third person who was injured in consequence thereof, after the work had been completed and accepted by the owner of the building; endorsing the rule of causal connection before referred to, and citing many cases to sustain the doctrine. Without further discussion, the same doctrine is announced in *Boswell v. Laird*, 8 Cal. 469, 68 Am. Dec. 345; *Paterson Extension R. Co. v. Rector etc.* (N. J.), 53 Atl. 449; *Marvin Safe Co. v. Ward*, 46 N. J. L. 19, and a wilderness of other cases bearing directly or indirectly upon this proposition.

The respondent attempts to show that many of the cases which we have reviewed did not sustain the doctrine of non-liability on the part of the contractor, but we think that they unquestionably do, and that the attempt has not been successful. Few of the cases relied upon by the respondent really sustain his view. From a thorough investigation of this question—for it has been an interesting one and the court is indebted to counsel on both sides for great research and industry in presenting it in a masterly way—we are compelled to hold that, especially in the absence of negligence on the part of an independent contractor—a question which under the testimony in this case we think is not pertinent—and especially where the structure has been taken over by the owner and accepted as completed under the plans and specifications, such contractor is not responsible to third parties for injuries sustained by any defects in such structure.

There was some question raised by the respondent in relation to the illegality of the manner of acceptance, but the

whole testimony is conclusive that, while there might have been some technical omissions, as a matter of fact the state did have control of the armory; that the officer appointed by the state to receive it had passed upon and received it; that it was in the possession of the state at the time of the accident; and that the parties who were injured were there by invitation of the state alone.

Under such circumstances the judgment of the court will be reversed. While the court undoubtedly, and so candidly stated, granted the motion for a rehearing alone on the alleged misconduct of the jury, there were some other questions raised on the motion, and the court, in response to the request of counsel for the respondent, made the order general; so that the cause will be remanded with instructions to pass upon questions raised upon the motion for a new trial other than the ones discussed in this opinion; and if not sustained upon such other grounds, the court will enter judgment upon the verdict of the jury.          •

RUDKIN, C. J., MORRIS, CROW, and CHADWICK, JJ., concur.