[Criminal No. 876. Filed May 29, 1939.]

[90 Pac. (2d) 988.]

J. F. ENGLE and JACK SHOWELL, Appellants, v. STATE OF ARIZONA, Respondent.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellants.

Mr. John W. Corbin, County Attorney, Mr. Lin Orme, Jr., and Mr. Richard G. Johnson, his Deputies, for Respondent.

LOCKWOOD, J.—J. F. Engle and Jack Showell, hereinafter called defendants, were informed against by the county attorney of Maricopa county for the crime of maintaining a public nuisance. The charging part of the information, so far as material to the determination of this case, reads as follows:

"The said J. F. Engle and Jack Showell on or about the 28th day of June, 1938, and before the filing of this information at and in the County of Maricopa, State of Arizona, did then and there, wilfully, unlawfully and indecently keep and maintain a public nuisance, a misdemeanor, by then and there, in and about those certain premises being and situate at No. 27 South Central Avenue, City of Phoenix, Maricopa County, State of Arizona, and commonly known as the 'Western News Exchange,' keeping and maintaining a common gaming and gambling room and house, said gaming and gambling room and house aforesaid being kept and maintained as aforesaid by said defendants then and there, wilfully, unlawfully and indecently keeping and maintaining a place and room in and upon said premises, situate as aforesaid, for the purpose of permitting large numbers of persons to daily, commonly, notoriously, habitually and publicly congregate and assemble for the purpose of betting and wagering with said defendants as hereinafter alleged and wherein, pursuant to said defendants' purpose aforesaid and with their permission and at their invitation, large numbers of persons, in number in excess of twenty-five but the exact number being to the County Attorney unknown, did daily, commonly, habitually, publicly and notoriously congregate and assemble for the purpose of wagering and betting various sums in lawful money of the United States of America, the exact amounts thereof being to the County Attorney unknown, with said defendants, upon the outcome and result of horse races then being daily run, held and conducted by persons whose names are to the County Attorney unknown at places outside of the boundaries of the State of Arizona, the exact places being to the County Attorney unknown, and said persons so daily, commonly,

habitually, publicly and notoriously congregating and assembling as aforesaid did daily, commonly, habitually, publicly and notoriously bet and wager with said defendants large amounts of lawful money of the United States of America, the exact amounts thereof being to the County Attorney unknown, and said defendants did then and there, daily, commonly, habitually, publicly and notoriously bet and wager large amounts of lawful money of the United States of America, the exact amounts thereof being to the County Attorney unknown, with said persons so congregated and assembled as aforesaid, upon the outcome and result of said horse races, daily run, held and conducted as aforesaid, and said defendants did then and there, indecently, unlawfully and wilfully, publicly accept, in the presence of all persons so congregated and assembled, bets and wagers, made by such persons and did publicly receive the money so bet and wagered upon such horse races and did publicly and in the presence of all persons so assembled and congregated pay to any of said persons winning bets and wagers made with said defendants as aforesaid, the money so won by such person or persons; that said gaming and gambling room and house so kept and maintained by defendants was then and there indecent and offensive to public decency; that said gaming and gambling room and house, so kept by said defendants as aforesaid interfered with the comfortable enjoyment of life by a considerable number of persons, citizens and residents of Maricopa County, to-wit, in excess of one hundred, the exact number of persons so interfered with by said nuisance so kept and maintained by defendants being to the County Attorney unknown.''

The defendants appeared and demurred to the information, and then, without waiving their demurrers, entered into a stipulation of facts. This stipulation, in substance, was as follows. The defendants occupied the room charged in the information, in which they conducted the business of taking and accepting bets upon the result of horse races run in states other than Arizona, and the paying of said wagers to the

winners, if any. These premises are open to the public and large numbers of persons, never less than twenty-five and sometimes as many as one hundred, daily assemble there, with defendants' permission and invitation, and wager large amounts of money with the defendants upon the result of certain horse races. Previous to the running of the race, patrons of the exchange select a horse or horses upon which they wish to bet, and the defendants receive all money so wagered by their patrons upon the races. When the bet is placed, a record is kept by the defendants of the amount bet and the horse chosen. The progress of each race and the result thereof is telegraphed to the defendants from the states in which the race is run and the wagers are then settled in accordance with the odds fixed and determined through the pari mutuel machines in use at the parks where the races are run, with these limitations: no matter what the odds may be as established by the pari mutuel, the defendants never pay off wagers at greater odds than sixteen to one, but they pay regardless of whether the amount necessary is greater or less than the total taken in by them as wagers. These wagers made by defendants with their patrons are not registered in any pari mutuel machine, nor do they have any effect whatsoever on the odds paid on the winning horses. These odds are determined solely by the pari mutuel machines at the parks where the races are run. It is admitted by defendants that the operation of the business described as above interferes with the comfortable enjoyment of life by a considerable number of persons in Phoenix.

The court overruled the demurrers to the information, and on the above stipulation of fact found that the defendants were guilty of maintaining a public nuisance, under section 4693, Revised Code of 1928, which reads, so far as material, as follows:

*"Public-nuisance; maintaining; penalty.* Anything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . by any considerable number of persons, . . . is a public nuisance, and is no less a nuisance because the extent of the annoyance or damage inflicted is unequal. Every person who maintains or commits any public nuisance, *the punishment for which is not otherwise prescribed,* . . . is guilty of a misdemeanor." (Italics ours.)

It is obvious that the stipulation of facts conforms substantially to the allegations of the information. If, therefore, the information does allege a violation of section 4693, *supra,* the court properly found the defendants guilty. If it does not, the court should have sustained the demurrers.

A public nuisance is defined by the section as being anything which is injurious to health, or indecent or offensive to the senses so as to interfere with the comfortable enjoyment of life or property by any considerable number of persons. But it is not everything which falls within this definition which is punishable under section 4693, *supra.* It is only public nuisances, *the punishment for which is not otherwise prescribed,* which fall within the section. The first question for us, therefore, is whether the acts set up in the information fall within the definition of a public nuisance, and the second, whether they are punishable by some other provision of our law.

██ From time out of mind the term "nuisance" has been regarded as incapable of precise definition, because the controlling facts are seldom alike, and each case stands upon its own footing. The term is so comprehensive that it has been applied to almost all wrongs which have interfered with the rights of citizens, whether in person, property or the enjoyment of his property or his comfort. *Melker* v. *New York,* 190

N. Y. 481, 83 N. E. 565, 13 Ann. Cas. 544, 16 L. R. A. (N. S.) 621; *Thornton* v. *Dow,* 60 Wash. 622, 111 Pac. 899, 32 L. R. A. (N. S.) 968. The old definition given by Blackstone as ''anything that worketh hurt, inconvenience or damage'' means substantially the same as our statute, although the latter uses a much greater number of words to reach the same result. 3 Blackstone Com., p. 216; 46 C. J. 645, and cases cited. While in Arizona we have no common law crimes, nevertheless when an act is declared to be a crime by its common-law name, common-law interpretations and cases are persuasive as determining whether any particular act constitutes the statutory offense. 12 C. J. 196, and cases cited. In the case of *Multnomah County Fair Assn.* v. *Langley,* 140 Or. 172, 13 Pac. (2d) 354, the Oregon court had under consideration section 14–722 of the Code of 1930, which provides:

''If any person shall willfully and wrongfully commit any act which grossly injures the person or property of another, or which grossly disturbs the public peace or health, or which openly outrages the public decency and is injurious to public morals, such person, *if no punishment is expressly prescribed therefor by this Code,* upon conviction thereof, shall be punished by imprisonment in the county jail not less than one month nor more than six months, or by fine not less than $50 nor more than $200.'' (Italics ours.)

The court, applying the principle of statutory construction above referred to, held that the section just quoted was intended by its language to cover offenses against the public peace, health and morals not elsewhere punishable by the Code, and which were known at common law as ''indictable nuisances.'' We are satisfied that section 4693, *supra,* was inserted in our Code for the same purpose, and that any act which, under the common law, was construed as a public nuisance, is a violation of that section, and punishable

thereunder unless the act is made punishable elsewhere in our law. The Oregon court, in the case of *State* v. *Nease,* 46 Or. 433, 80 Pac. 897, had under consideration an information charging a public nuisance on facts practically identical with those shown by the information and stipulation in the case at bar. The court said:

" . . . That such a house is a gaming or gambling house, and punishable as a nuisance at common law, whether betting on a horse race is a crime or not, has so often and uniformly been held by the courts that it is no longer open to discussion. There is no dissent in the adjudged cases, and it is unnecessary to do more than cite the authorities: *McBride* v. *State,* 39 Fla. 442, 22 So. 711; *Thrower* v. *State,* 117 Ga. 753, 45 S. E. 126; *Swigart* v. *People,* 154 Ill. 284, 40 N. E. 432; *Swigart* v. *People,* 50 Ill. App. 181; *Cheek* v. *Commonwealth,* 79 Ky. 359; *People* v. *Weithoff,* 51 Mich. 203, 16 N. W. 442, 47 Am. Rep. 557; *People* v. *Weithoff,* 93 Mich. 631, 53 N. W. 784, 32 Am. St. Rep. 532; *McClean* v. *State,* 49 N. J. Law, 471, 9 Atl. 681; *Miller* v. *United States,* 6 App. D. C. 6. . . . "

We are satisfied that an establishment conducted as was that of defendants is a public nuisance under section 4693, *supra,* whether betting on a horse race be a crime or not, and we consider it unnecessary to discuss the question further.

The real issue is whether there is another statute which punishes the keeping of an establishment of the kind shown by the information, for if there is, by the express terms of section 4693, *supra,* any prosecution must be brought under the specific statute, and not under the general nuisance act. Let us, therefore, examine our Code to see whether the act charged could be punished under any other provision thereof. Article 9 of chapter 104, Revised Code of 1928, is entitled "Gaming" and is the only portion of our law which specifically provides punishment for any form of

gambling. This article includes sections 4671 to 4685 of the Code. Section 4671 makes it a misdemeanor to carry on certain games specified in the section. Section 4672 punishes the owner of gambling houses where any of the games prohibited by section 4671 are carried on. The material portion of section 4673 reads as follows:

"*Conducting banking or percentage game; penalty.* Every person who . . . shall conduct, or . . . participate in, either as owner, proprietor, employee, or participant, . . . any banking or percentage game whatsoever, played with cards, dice or any device, . . . shall be guilty of a misdemeanor. . . . "

Section 4674, so far as material, reads as follows:

"*Owner, lessee and manager liable; penalty.* If any proprietor, owner, or part owner, lessee, manager or any person having management, supervision, or control, temporary or permanent, of any gambling house or other resort maintained for gambling, or of any building, shall permit any of games, mentioned in the preceding sections to be played in such place, he shall be guilty of a misdemeanor . . . "

Section 4675 prohibits municipalities from licensing any gambling game or game of chance of any kind, or any place where they are carried on. Section 4676 makes it a penalty to conduct any trick game or "any lottery, or lottery scheme or device, or raffle." The balance of the article refers to what is commonly known as bucket shops, except section 4684, which permits injunctive relief against using any premises for carrying on any of the activities prohibited by chapter 104, *supra.*

 It is plain, on examining article 9, *supra,* that the only portions thereof which could possibly apply to the business conducted by defendants are section 4673, and the last sentence of section 4676 which cover "any banking or percentage game whatsoever,

played with cards, dice, or any device" and "any lottery, or lottery scheme or device, or raffle." If the business carried on by defendants does not fall within either of these categories, it was not prohibited by article 9, *supra,* and they were not punishable under the provisions of that article. First, as to banking or percentage games. We have had under consideration in the case of *McCall* v. *State,* 18 Ariz. 408, 161 Pac. 893, Ann. Cas. 1918A, 168, the question of whether the operation of what is commonly known as a pari mutuel machine was within the prohibition of section 4673, *supra,* as a banking game played with cards, dice or any device. Therein we held that, in order to sustain a conviction of operating a banking or percentage game played with cards, dice or any device, the test was whether the implement or device was used in determining who should win or lose, and whether it was an integral part of the actual gambling, and that when the device had nothing to do in determining who should win or lose, the case was not within the statute. We further held that a person who operated a pari mutuel machine was not operating a banking game; for the reason that he did not wager any money against any person, but acted merely as the stakeholder for the purpose of distributing the money played by the bettors. The facts of the present case differ from that of the McCall case in that defendants did not themselves operate a pari mutuel machine, but made wagers against any who desired to bet with them on the result of certain races run in other states, and that the only connection of the pari mutuel with their business was that it determined, within certain limitations, the odds on which the winners were to be paid off. Unlike the operator of a pari mutuel machine, the defendants were not stakeholders, but wagered their own money against all who cared to bet. This brings them within the definition of a banking game. 27 C. J. 970, and

cases cited. But it was not a banking game played "with cards, dice or any device," within the meaning of *McCall* v. *State, supra*. It was a banking game with its results determined by the results of a horse race and the total amount bet on that race at the track where it was run. We are satisfied that defendants could not have been punished for maintaining a gambling room where banking or percentage games operated by cards, dice or any device were carried on.

 Was it then a lottery or raffle? A lottery may be defined as a scheme for the distribution of prizes or other things of value by lot or chance among persons who have paid or agreed to pay a valuable consideration for the chance to obtain a prize. 38 C. J. 287, and cases cited. In conformity with this definition, it is obvious that the three necessary elements are (a) the offering of the prize, (b) giving of a consideration for an opportunity to win the prize, and (c) the awarding of the prize by chance. The first two elements may be said to be present in defendants' business, but does the third appear therein? This comes down to the question of whether horse racing is a game of chance or one of skill, either of man or horse. A game of chance may be defined as any sport or amusement involving physical contest, whether of man or beast, determined entirely, or in the main part, by mere luck, and in which judgment, skill or adroitness have no place or else are thwarted by chance. *State* v. *Gupton,* 30 N. C. 271; *Rex* v. *Fortier,* 13 Que. K. B. 308, 7 Can. Cr. Cas. 417. It is the character of the game and not the skill or want of skill of the individual player which determines whether the game is one of chance or skill. The test is not whether it contains an element of chance or element of skill, but is chance the dominating element which determines the

result of the game. As was said in *State* v. *Gupton, supra*:

"It is true, that in these latter instances superiority of skill is not always successful—the race is not necessarily to the swift. Sometimes an oversight, to which the most skilful is subject, gives an adversary the advantage; or an unexpected puff of wind, or an unseen gravel in the way, may turn aside a quoit or a ball and make it come short of the aim. But if those incidents were sufficient to make the games, in which they may occur, games of chance, there would be none other but games of that character. . . . The incidents mentioned, whereby the more skilful may yet be the loser, are not inherent in the nature of the games. Inattention is the party's fault, and not his luck; and the other obstacles, though not perceived nor anticipated, are occurrances in the course of nature and not chances." 27 C. J. 969. See, also, *Wortham* v. *State,* 59 Miss. 179.

There is some conflict perhaps in the cases as to whether horse racing be in itself a game of chance, but we think the decided weight of authority and reason is that it is not. In any game there is a possibility that some oversight or unexpected incident may affect the result, and if these incidents are sufficient to make a game in which it may occur one of chance, there is no such thing as a game of skill. We are decidedly of the opinion that the business conducted by defendants was in no manner a lottery or raffle, although of course it was gambling. But as we have said, gambling *per se* is not prohibited by our law. It is only certain specified forms of gambling that are forbidden, and it is only the keepers of houses where these particular forms are carried on who are punished by the provisions of article 9, *supra*. Defendants, therefore, could not have been punished under that article for conducting the business described in the information.

 The only other specific section which it is suggested might cover the offense is 4664, Revised Code of 1928, which reads as follows:

"*Keeping disorderly house; punishment.* Every person who keeps any disorderly house, or any house or place of general or public resort by which the peace, comfort or decency of the immediate neighborhood is habitually disturbed, or who keeps any inn, hotel, rooming or lodging house in a disorderly manner, is guilty of a misdemeanor."

It is the contention of defendants that the keeping of a common gambling house, such as is described in the information, falls within the section just quoted.

Respondent, on the other hand, insists that it applies only to houses of prostitution and places of a similar nature, and was not intended by the legislature to cover gambling houses.

In order to determine the matter, it is necessary that we trace the history of this section in our law. A recapitulation and review of the various acts applying to the question would extend this opinion unduly and unnecessarily, and we merely state our conclusion after an exhaustive and critical examination of all of our legislation upon the matters involved, from the Howell Code of 1864 to the present time.

We are of the opinion that it appears clearly from this legislation that section 4664 of the Revised Code of 1928, which makes the maintenance of disorderly houses a crime, was not at any time intended by our legislature to apply to any class of disorderly houses except such as are commonly known as bawdy houses, assignation houses or houses of ill fame, and the like, and was not meant to apply to places where public gambling was carried on.

 This leaves section 4693, *supra,* as the only provision of our law under which the acts set forth in the information can be punished as a public offense,

and such being the case, the court correctly overruled the demurrers and rendered judgment finding the defendants guilty thereunder.

The judgment is affirmed.

ROSS, C. J., and McALISTER, J., concur.