## GERKIN *v.* BROWN & SEHLER CO.

1. AMENDMENT—DECLARATION—PERSONAL INJURIES—POISONS.
   An amendment of plaintiff's declaration which charged defendant with manufacturing and selling a dyed, fur-lined coat which contained coloring matter deleterious to life and health of the wearer, so as to charge that defendant was engaged in the business of selling at wholesale and jobbing such fur-lined coats, knowing the dangerous or poisonous character of the material used, did not change the identity of the litigants, or introduce a new cause of action, and was a proper amendment.

2. SAME—CONTINUANCE—SHOWING.
   But upon defendant's showing that it was surprised by the proposed amendment, asked for at the trial, that defendant had prepared to meet the charge made in the original declaration to which it was a defense that defendant was not acting as manufacturer of the goods but as a jobber, and that it was necessary to procure evidence which defendant could not obtain in time to meet the case made in the amended declaration, the court should have allowed a continuance over the term; a postponement of four days, shown by defendant's affidavit to be insufficient, was not a proper exercise of the discretion of the court.

3. SAME—ADJOURNMENT—ADMISSION AS TO TESTIMONY.

Plaintiff's admission that the witness mentioned in defendant's affidavit would give the testimony stated therein, was not a proper basis for denying the application for continuance under Circuit Court Rule 22.

4. NEGLIGENCE — POISONOUS DYES — DELETERIOUS SUBSTANCES — SALES—TORTS—PROXIMATE CAUSE.

Evidence that the plaintiff bought a fur-lined coat, handled and sold by defendant to a local dealer, that he frequently had occasion to turn the fur collar up about his face and neck, that he had never suffered previously from any skin or blood disease, that about two weeks after he commenced to wear the coat he experienced a burning sensation on his face and neck which later developed into serious inflammation and grew better when he ceased to wear his coat, taken in connection with a letter from defendant to plaintiff admitting that some persons were injuriously affected by dyed fur, supported by other testimony of the same kind, warranted the court in submitting the case to the jury on the question of negligence and notice to defendant.

5. SAME—PRIVITY OF CONTRACT—FRAUD, ABSENCE OF.

As a general rule the vendor of an article is not liable on account of his carelessness or negligence to others than the immediate purchaser, for mistakes in the nature or quality of an article, where the thing sold is in itself harmless, so far as the vendor knows, if he has made no false representations.[1]

6. SAME—NOTICE OR KNOWLEDGE OF DANGEROUS MATERIAL.

Having knowledge that dyed furs of the kind defendant sold were liable to cause suffering and injury to the purchasers, even though only a small proportion of persons were injuriously affected, defendant was liable in damages to one who was injured in ignorance of the poisonous character of the furs or dyes.

Error to Livingston; Miner, J. Submitted April 29, 1913. (Docket No. 85.) Decided September 30, 1913.

---

[1] As to the liability of a manufacturer, packer or vendor to persons not in privity of contract, for injury from defects in article sold, see note in 19 L. R. A. (N. S.) 923.

Case by Henry C. Gerkin against the Brown & Sehler Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Cleland & Heald,* for appellant.

*Shields & Shields,* for appellee.

STEERE, C. J.   This was an action of tort, wherein plaintiff recovered, in the circuit court of Livingston county, a judgment against defendant in the sum of $500, as compensation for injuries resulting to plaintiff from wearing a fur-lined coat with a dyed, or blended, collar, which, it is claimed, poisoned his neck, face, and hands, causing him great suffering, and seriously injured his health.

Plaintiff bought the coat, which had on it a dyed muskrat fur collar, on December 13, 1910, from Young Bros., a firm of local retail dealers in Howell, Mich., where he resided.   They bought it about a month previous, in the regular course of merchandising, from defendant, a business concern in Grand Rapids, Mich., engaged in jobbing fur coats, robes, blankets, etc., and in manufacturing harness and collars.   The local dealers were regular customers of defendant. The coat was sold to them by one of defendant's traveling men, who, it is claimed, represented to them in plaintiff's presence, in their store, at the time he took their order, that defendant manufactured the coat; that it was guaranteed in every particular, was made out of good material, and would give good service.

Exception is taken and error assigned on the admission of testimony as to these representations by the traveling salesman.   Plaintiff produced no other evidence that defendant manufactured the coat. Aside from this testimony, the undisputed evidence was clear and positive that defendant did not make the coat, nor know how it was made; had never dyed furs, nor manufactured fur garments, but had pur-

chased the coat, with others, on the market in New York from Wasserman & Shecket, the manufacturers, who procured the fur ready dyed from a firm of fur dealers.

Plaintiff's declaration, as it stood until both parties had rested their case during the trial, charged, and was framed upon the theory, that defendant was engaged "in the manufacture and sale * * * of blankets, robes, and fur coats, fur-lined coats, and saddlery," and had sold this fur-lined coat, "so manufactured as aforesaid," knowing, when it was manufactured, and when it was sold, that the coloring used and material of which the collar was made were "so poisonous and yet so concealed as to become eminently and necessarily dangerous to the life and health of those wearing the same."

Defendant pleaded the general issue, and its primary defense, to the support of which its evidence was chiefly directed, was that defendant did not make the garment, was not a manufacturer, but a jobber, and bought the article in the usual course of trade, in the eastern market, with no knowledge of how, or, at the time, by whom the fur was dyed.

At the conclusion of plaintiff's testimony, and again after both parties had rested, defendant's counsel moved for a directed verdict in its favor, on the ground that there was no competent evidence to go to the jury on the charge that it had manufactured the coat, or that any injurious dyes were used in its manufacture by defendant, or any one else; in that connection moving that the court strike out all testimony, previously objected to, touching statements by the traveling salesman to the local dealers, to the effect that defendant had manufactured the coat.

In disposing of this motion, the trial court expressed the view that defendant would not be bound by such statements of its agent so far as plaintiff was concerned, he being a third party not participating in

the transaction in which the representations were
made, saying to counsel:

"Under this declaration, as it now stands, I have
grave doubts about the plaintiff being entitled to re-
cover, for this reason: that the declaration alleges
that Brown & Sehler are the manufacturers. I think,
if that question should come before the jury, the court
would be obliged to instruct the jury that the evi-
dence is that they are not the manufacturers."

This ruling would, in effect, remove from the case
and render unimportant the testimony excepted to,
and which it was moved to strike out.

Following this intimation of the court, made after
both parties had rested, counsel for plaintiff asked
leave to amend his declaration by adding a count
charging that defendant was, at the time of the sale,
"engaged in the business of selling at wholesale and
jobbing fur-lined coats of the description in the two
counts in this declaration, knowing that the fur-lined
coats were dangerous, contained poisonous and dele-
terious substances." This amendment was opposed
on the ground that it introduced a new issue, and
stated an entirely new and different cause of action
from the one on which the case had been tried, re-
quiring a different and additional line of testimony
not then available, and which could only be obtained
from New York, where the fur was dyed and the coat
manufactured, and where the necessary witnesses
then were; that, the declaration having charged de-
fendant, as a manufacturer, with making this coat
and dyeing the fur, proof of such charge was neces-
sary to entitle plaintiff to recover, and proof to the
contrary was a complete defense, for which defend-
ant had prepared, and which it had successfully made,
and was then entitled to the benefit of; further ask-
ing and urging that, if in any event the court in its
discretion should hold it proper to grant the amend-

ment, a continuance over the term be allowed to enable defendant to procure further testimony rendered necessary by such amendment.

After argument the amendment asked for by plaintiff was allowed on April 18th, and the trial postponed until the next Monday, April 22d, to allow defendant to produce further testimony; plaintiff being directed, in the meantime, to put in typewriting, file, and serve the amendment, which had been orally presented by counsel and taken by the stenographer. A copy of said amendment was served upon defendant's attorney on Saturday, April 20th. It charged defendant as a dealer with knowledge, instead of as a manufacturer.

On Monday, April 22d, defendant's counsel presented in proper form a motion, asking continuance of the case over the term for the following reasons:

"(1) After the close of the testimony in said cause, and after the court had announced that he would be obliged to direct a verdict in favor of the defendant, the plaintiff was permitted to amend his declaration so as to require an entirely different defense on the part of the defendant.

"(2) That the defendant is not prepared to make such defense.

"(3) That the defendant was surprised by the amendment to the declaration of said plaintiff.

"(4) That some of the witnesses needed by the defendant to make a defense to the amended declaration reside in New York, and it is impossible to procure their attendance or deposition in time for the trial of said cause."

This motion was based upon and supported by affidavits containing the usual averment of merits, and showing, amongst other things, that in a preliminary correspondence over this contention, had before suit was begun, defendant's counsel took pains to distinctly notify plaintiff's counsel that defendant did not manufacture the coat, and therefore, when plain-

tiff's declaration was filed charging it as the maker,
had assumed and believed such charge was under-
standingly made, intended, and relied upon; that the
defense accordingly prepared to meet that controlling
issue, and a motion to amend at the trial was conse-
quently a complete surprise; that every effort had
since been made in the time allowed to get the desired
testimony by wire and long distance telephone, the
services of an attorney in New York being engaged
to that end, but owing to the distance between the
place of trial and New York it was impossible to have
the witnesses before the court in person, or their
depositions in time for resumption of the trial as set.
The affidavits also stated, in part and in general
terms, what it was expected to prove by the witnesses
whose testimony was desired, and that, amongst other
things, defendant, as a result of recent investigation,
expected to prove by the dyer of the fur used in the
coat complained of that there were no poisonous or
deleterious ingredients used in the dyeing, and the fur
was harmless to any one wearing it.

The court denied this motion for continuance, on
condition that the plaintiff admit that the dye mas-
ter, if present, would testify as stated in the affidavit
(which plaintiff's counsel thereupon admitted), hold-
ing that defendant's attorneys knew or ought to have
known that such an amendment was, under the lib-
eral statute of amendments, likely to be made, and
should have prepared their case to meet it.

The proposed amendment did not change the iden-
tity of litigants nor the form of action, nor, strictly
speaking, introduce a new cause of action; it charged
that defendant committed the same tort in a different
capacity. It was within the scope of section 10268,
3 Comp. Laws (5 How. Stat. [2d Ed.] § 12969), for
the court, in its discretion, to allow the same on such
terms as were just, and did not ultimately deprive
defendant of any essential rights. As the pleadings

and proofs then stood, it was the opinion of the court that defendant had made good a legitimate, if technical, defense, and a verdict must be directed in its favor; but that, for the furtherance of justice, the amendment should be granted. On granting such motion, it was incumbent upon the court to guard against it resulting in defendant's being put to a disadvantage or denied opportunity for full defense as the pleadings stood after the amendment.

The suggestion that defendant should anticipate and prepare to meet an amendment which nullified a previously good defense loses force under the undisputed showing that plaintiff was fully advised of this defense, and with such knowledge challenged it, by specifically charging defendant with committing the tort as a manufacturer. In view of the time when, and circumstances under which, the motion to amend was made, and the showing in opposition, we think there is substantial ground for the contention that to deny defendant's application for reasonable time to investigate, and opportunity to procure and present such further testimony as it desired to meet the case made in the amended declaration, deprived it of a substantial right. The time allowed did not give defendant opportunity to investigate and procure testimony from New York, the only place where the requisite testimony was available according to the undisputed showing. It was not a second motion for continuance, in which a concession that the desired witnesses would testify as stated in the application is ground for denial, under Circuit Court Rule 22. If defendant, taken by surprise as claimed, was entitled to any time to investigate and procure further testimony, it was entitled to sufficient time and opportunity to get before the court the desired witnesses or their depositions. Where material changes are allowed in the declaration during the trial, which may call for a different line of defense supported by addi-

tional testimony, it has been said by this court that to proceed or take a continuance is "the usual option" of defendant. *Jennings* v. *Sheldon,* 53 Mich. 431 (19 N. W. 132). The general policy recognized in this State is to allow continuances in such emergencies, wherever surprise is claimed under such conditions as reasonably justify the claim, and when time is asked to investigate and produce further testimony. *Lester* v. *Thompson,* 91 Mich. 245 (51 N. W. 893); *Leonard* v. *Leahy,* 169 Mich. 406 (135 N. W. 335); *Berry* v. *Railway Co.,* 173 Mich. 181 (138 N. W. 1038).

Under the circumstances disclosed and showing made by defendant, it was the duty of the court, having in its discretion granted the amendment, to grant a continuance, either over the term, or for sufficient time to permit defendant to procure the witnesses desired or their depositions. We conclude that upon this proposition a new trial must be granted.

Counsel have discussed in their briefs the underlying principles involved in this case, and, as a retrial must be granted, it seems proper here to give some consideration to the questions which will necessarily arise again.

Plaintiff's right of action is based on the contention that poisonous dyes were used in the preparation of the fur which went into this coat; that defendant knew this, or ought to have known it, and also knew that certain persons wearing the coat were liable to be injuriously affected; that it was therefore its duty to impart such knowledge to the purchaser, which it failed to do.

Plaintiff furnished no proof of how the fur was dyed or what preparations were used. His proof upon that subject is inferential only. His evidence establishes a connection between cause and effect, tending to show that wearing the coat was the occasion of his malady. Briefly stated, his testimony

shows that he was a strong, healthy man, in the prime of life, engaged in a calling which necessitated his taking long drives in the country in all kinds of weather; that he bought and wore this coat to protect himself from the cold when on such drives, and often had occasion to turn the fur collar up to protect his face and neck; that he never before had been affected with any skin or blood disease; that about two weeks after beginning to wear this coat he at times experienced a burning and stinging sensation on his face and neck, for which he was unable to account, and which later developed into serious inflammation, swelling, and discoloration of his face, hands, and eyes, so severe and distressing as to incapacitate him for work and confine him to his house in misery; that he was treated, unsuccessfully, by local physicians, his condition growing worse until about the 14th of March, when he went to Detroit and consulted a skin specialist, after which he ceased to wear the coat, and grew gradually better from that time on; though not for some time suspecting the cause, he finally remembered and understandingly noted that during January, February, and the fore part of March there was a difference in his condition, depending on whether or not he wore the coat; that previous to this trouble he had no knowledge that wearing dyed fur might be dangerous to the wearer. There was abundant evidence, to go to the jury, tending to show that plaintiff's malady resulted from wearing the coat.

Plaintiff also introduced in evidence a letter written by John Sehler, president of the defendant company, in reply to one from the local dealer who sold the coat to plaintiff, containing the following:

"We have yours of the 16th, and fully note contents. Now, we have had much experience with fur-lined coats with different collars, and about one out of every hundred customers we sell to we find can-

not wear any kind of a dyed collar, no matter how much it is cleaned."

Sehler, being sworn as a witness, testified that he was in charge of the fur-coat department of defendant, had been handling fur coats and fur-lined coats for at least 10 years, and had knowledge as a dealer of at least 10,000 they had sold; that very seldom, but occasionally, complaints had been received from dealers to whom they had sold of certain fur coats making their customers' faces sore, but they did not know the soreness was caused by poisonous or injurious dyes used in coloring the fur; that during the 10 years mentioned something like 20 complaints, or about one in a hundred coats sold, came to them that a coat made trouble; that the coat in question was the only one of those purchased from the firm of Wasserman & Shecket that there was any complaint about; that outside of this case witness never knew of any one who wore a fur coat purchased from defendant being incapacitated or laid up by wearing it; that he possessed no knowledge of any poisonous material being used in dyeing furs, though he had tried to ascertain by inquiry of manufacturers and people who dyed the furs, and could not learn that there was. In answer to questions asked on cross-examination, witness testified as to knowledge and notice in part as follows:

"From the information I derived from the talk of the people who were familiar with manufacturing, handling, and even wearing furs, I learned that some of them had trouble with them. I did not go to any one of the 20 or 25 that had worn our fur-lined coats and had physical trouble from them and inquire of them. I did not make an investigation in a single case where a fur-lined coat of ours was claimed to have injured the purchaser. I did not ever make any arrangement and have an expert physician or expert on skin diseases or troubles investigate any one of those cases that you have just described. I simply

told them to send in the coat and not to wear it any longer. I did that something like 25 times in the 10 years preceding this 1909. I did all I could to prevent the coats sold by us from injuring people. I went to headquarters, to the manufacturers, and tried to find out what was wrong. I did find out. I found out from everybody that some people simply could not wear dyed furs; that it was their condition. That was the only answer I ever got. I knew that when I sold this coat, Exhibit C, to Young Brothers. I did not notify Young Brothers that I had that information and knowledge, and that in selling that coat they must notify the person that it was a dyed collar. * * * We told Mr. Allen (the traveling salesman) that whenever there was a complaint about the coat to take up the coat and send it in and change the collar."

On re-direct examination witness testified:

"In making this investigation with manufacturers and people who knew the fur business, as to the reason for fur-lined coats causing sore skin with some people, I found out that some people simply can't wear furs that are dyed; that seems to be the common accepted condition, knowledge among the fur trade, that some people, on account of their peculiar condition or the condition of the skin, cannot wear dyed furs. That is the information I got. I would like to add to that, all say that is a rare case; but they do find such cases."

It is the contention of defendant that a verdict should have been directed in its favor on the case as it stood when submitted to the jury, for the reasons that defendant did not sell the coat to plaintiff, and therefore no contractual relations ever existed between them; that no evidence was produced by plaintiff as to the manner of manufacturing the coat and dyeing the fur, or that any deleterious or poisonous chemicals were used in that connection; that no fraud, deception, or misrepresentation on the part of defendant is shown; and that defendant as a wholesale dealer only bought and sold the garment in the

usual course of trade, not knowing or believing that such apparently harmless article of wearing apparel in common use was, or could be, inherently and imminently dangerous, or that it contained any poisonous or deleterious substance which would injure the wearer.

It is clear in this case that there was no privity of contract between plaintiff and defendant and no implied warranty. Defendant was a wholesaler, buying from the manufacturer, and, in the absence of notice or special knowledge, practically in the same position as plaintiff, the final purchaser at retail, would be when buying an apparently harmless article of wearing apparel in common use; neither would be presumed to know of concealed dangers not naturally to be anticipated.

It is a general rule that the vendor of an article is not liable, on account of his carelessness or negligence, to others than the immediate purchaser for mistakes in the nature or quality of an article sold, where the thing sold is in itself harmless, so far as the vendor knows, and where he has made no false representations. *Davidson* v. *Nichols,* 11 Allen (93 Mass.), 514.

Plaintiff's counsel admit that, in the absence of knowledge by defendant, there could be no recovery, but urge the proposition that, having put upon the market an article which it knew was dangerous to some persons and might prove injurious to whoever ultimately bought and wore it, because the fur was dyed and contained some kind of poison or deleterious matter, a fact not generally known, and of which the garment in and of itself gave no notice, defendant owed the duty to the public and to plaintiff, the ultimate purchaser and wearer, to furnish with such article, when it put it forth, a notice of warning imparting to its customers, for the protection of any of the public to whom they might sell, the same knowl-

edge, and to the same extent, which defendant possessed.

There was evidence that dyed furs were injurious to some persons, and, where the fur came in contact with the skin, acted as an irritating poison, causing much discomfort and suffering, which, if continued, ultimately produced serious inflammation and malignant sores, ruinous to the health of the wearer; that such was the result to plaintiff, whose suffering was protracted and increased because he did not have, and for a long time was unable to obtain, the information defendant possessed. Sehler, defendant's president, had handled fur coats, dyed and undyed, for many years, and knew that some dyed coats were injurious to some people. Trouble along that line had come to his knowledge so often that he had made an investigation, and complaints of coats he had sold came to him to such an extent that he had adopted a policy in that connection. He knew that the trouble only came from the dyed fur. He did not know what dyes were used or of any test by which to determine what chemicals were used in the dyeing; but he did know that "some people simply could not wear dyed furs," and so adopted the plan, which the traveling salesman was told to observe, to have the coat sent in and change the collar on it for one that was not dyed when a complaint was made, giving the purchaser no preliminary warning, and leaving it for him to make the discovery by the slow and dangerous process of painful experience. Sehler objected to the use of the word "poison," and testifies, on cross-examination:

"I say that I never had heard of any of our collars poisoning the people that wore them. When I put in this letter, Exhibit C, the following sentence, 'We have one case in Otsego where a man was laid up for six weeks on account of having his neck poisoned from a fur collar,' that is what they called it, so I used

their language. In the other cases the language was that it made the customer's neck and face sore; that I do remember. I don't remember ever the word 'poison' being used. * * * In that letter, when I stated that one in one hundred of our coats made trouble to somebody, I referred to fur-lined coats only."

What percentage of these had undyed collars is not shown.

Dr. Biddle, the expert on skin diseases, whom plaintiff finally consulted, and on whose advice he discontinued wearing the coat, testifies, on cross-examination by defendant's counsel:

"I couldn't say and I haven't any idea the proportion of people who wear fur coats that are troubled with this irritation; but in my line of work we see cases occasionally. It is not very many, but still we see them; not more than half a dozen people or so affected with poisoning from furs come in to consult me during the course of a season, that is, that I could trace directly to the furs. * * *

"*Q.* How do you account then, Doctor, for the fact that some people are able to wear dyed furs without any difficulty and others not?

"*A.* We account for it in two ways: One is a possibility of there having been something in the manufacture of that particular coat or the dyeing of that particular coat which has not been—I don't know whether it is a different dye used or something else that has not removed the irritant. That is one. Then the other one is the manner in which the collar is worn. For instance, a man turns down his collar, didn't turn it up on his face, might wear a fur coat for a long, long while, never have it; if it comes a cold day, turns his collar up, might get that, so it depends a good deal on the condition of the coat and then also the manner of wearing it. Some people wear fur coats without ever turning the collar up; that class might wear a fur-lined coat for a winter without having any trouble. The irritant must come in direct contact with the face. * * * It is my opinion that it is the quality of the dye used and the condition

of putting it on the coat, in the individual coat, that causes that irritation."

It is the common understanding and a reasonable presumption that a fur coat is a harmless thing, free from suspicion of hidden dangers to any one, and the testimony shows that this is true in fact in all cases where the fur is not artificially colored; but it is shown that, if the fur is dyed, in certain cases some coats are imminently dangerous to the health of some persons, when used for the purpose for which they are manufactured and sold.

When the fact is once established and demonstrated by experience that a certain commodity, apparently harmless, contains concealed dangers, and when distributed to the public through the channels of trade and used for the purposes for which it was made and sold, is sure to cause suffering to, and injure the health of, some innocent purchaser, even though the percentage of those injured be not large, a duty arises to and a responsibility rests upon the manufacturer and dealer with knowledge, to the extent, at least, of warning the ignorant consumer or user of the existence of the hidden danger. Failing to do so, the dealer, as well as the manufacturer, who has the knowledge and does not impart it, is liable to a subsequent, ignorant purchaser, reasonably within contemplation of the parties to the original sale, for injuries sustained through such hidden dangers. This is by reason of the duty the dealer owes to the public generally, which includes all whom it may concern, to give notice of any concealed dangers in the commodity in which he traffics, and to exercise a reasonable precaution for the protection of others commensurate with the peril involved. We think this principle applicable to the case at bar and fairly deducible from the many authorities touching manufacture and sale of dangerous commodities. *Thornton* v. *Dow,*

60 Wash. 622 (111 Pac. 899, 32 L. R. A. [N. S.] 968), and authorities cited and reviewed in *Tomlinson* v. *Armour & Co.*, 75 N. J. Law, 748 (70 Atl. 314, 19 L. R. A. [N. S.] 923).

That the great majority of persons are safe from the particular danger concealed in the article sold, or that few injuries in fact result from its use, does not militate against this principle when the certain fact of imminent danger to a percentage is established. Many people are immune from the most virulent contagious diseases, and the percentage of injuries to those ignorantly using defective machinery or dangerous explosives, or unwholesome and dangerously adulterated foods, is small in proportion to the number who ignorantly or knowingly use them; but it could not be contended, for that reason, that the person knowingly renting a house or selling clothing which were infected with smallpox, or selling defective machinery, or tainted meats, or dangerous explosives, without warning, to one ignorant of the danger, and who was injured thereby, might escape liability.

Even in that class of cases in which it has been held that the vendor is not liable to those not in privity of contract with him for injuries resulting from his negligence, unless the article was manifestly dangerous, the inference is strong that with knowledge of the danger such liability would arise, even to strangers who were subsequent purchasers.

In *Slattery* v. *Colgate*, 25 R. I. 220 (55 Atl. 639), a dealer, selling to a barber shaving soap which contained an excess of alkali, resulting in injury to the latter's business, was held not liable in the absence of knowledge of the excess, limiting the rule to cases where the defect was not known at the time of the sale.

In *Gould* v. *Woolen Co.*, 147 Mass. 315 (17 N. E. 531), a case in many of its facts quite similar to this, plaintiff showed that she was poisoned in using cloths

manufactured by defendant and bought of its agent in 1884. An expert chemist and physician, who analyzed the cloth and found in it what he designated as "chrome compounds," stated that the cloth was mordanted by bichromate of potash, which was an irritant poison; that it was the chemical commonly used as a mordant in dyeing woolen cloth; that cloth so dyed might be poisonous to susceptible persons; that this chemical was extensively used in dyeing, and, so far as he knew, no case of poisoning similar to plaintiff's had been published until he published four or five cases in 1886, since which time he had seen several more; that he did not know how poisoning could be effected from the presence of chrome compounds in cloth. Being asked, "Is there anything further developed in relation to this kind of poisoning, other than that some people may be injured, who have a disposition that way, by the presence of this compound?" he answered, "Nothing more than occasionally persons may be injured by it, but the great majority of people not." While not deciding the question involved here, the court in that case emphasized the importance of knowledge as applied to such an issue, and held that plaintiff could not recover because of defendant's lack of knowledge, saying:

"The plaintiff's action was brought on September 22, 1884. According to the testimony of the expert witness introduced by the plaintiff, it had never been shown, until 1886, that any cases of poisoning had occurred like the plaintiff's. For all that appears, the plaintiff's was the first instance of injury that ever was known to arise from the cause alleged in the declaration. All that the plaintiff showed against the defendant was, that it used an article for dyeing its cloths which was the most common mordant used in wool dyeing, which was also used very extensively in dyeing cotton stockings black, which, so far as then known, had never caused injury to anybody who merely handled the cloths, and which the defendant did not know or suppose, and had no reason to know

or suppose, to be injurious; and, under the circumstances, although there was evidence tending to show that, in point of fact, the plaintiff was injured by merely handling the cloths, this was not a result which the defendant was bound or ought to have contemplated as likely to happen."

We conclude there is evidence of defendant's negligence in this record sufficient to carry the case to the jury, and, as already indicated, that defendant should have been permitted to exercise the "usual option" of a continuance to obtain and present such evidence as it desired to meet the declaration as amended.

The judgment is reversed, and a new trial granted.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.