**FLYNN v. CRUME et al.**

No. 6602.

Circuit Court of Appeals, Seventh Circuit.
Jan. 20, 1939.

Rehearing Denied Feb. 18, 1939.

Russel J. Wildman, of Peru, Ind., for appellant.

662

Benjamin F. Long, of Logansport, Ind., and Eli F. Seebirt, of South Bend, Ind. (Long & Yarlott, of Logansport, Ind., and Seebirt, Oare & Deahl, of South Bend, Ind., of counsel), for appellees.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Plaintiff's cause of action was based on the double liability provision of the National Banking Act (12 U.S.C.A. secs. 63, 64).*

We will refer to Clara E. Crume as defendant and Marshall E. Crume as her husband.

Defendant was charged with knowledge of the impending bank failure when she transferred her stock to her husband and with intent to escape the statutory liability. Plaintiff also alleged that defendant was and is the actual owner of the stock because the purported transfer to her husband was null and void, without consideration, and made for the purpose of defrauding creditors of the bank by unlawfully evading a national bank stockholder's liability.

The sole question is over the existence of substantial evidence to sustain a jury finding that defendant had knowledge of the impending failure of the bank to meet its obligations when she transferred her stock to her husband.

■■ The test in the case of a peremptory instruction is too well known to require the citation of authorities. It is this: If the record discloses substantial evidence from which reasonable men might find the material, controverted issues in favor of the plaintiff, it is improper to direct a verdict for the defendant. Ordinarily only the evidence most favorable to the party against whom the motion is granted, need be examined. Otherwise the court might assume a fact which the jury would find, upon disputed evidence, to be otherwise.

What, then, are the facts upon which the plaintiff's case rested?

The total capital stock of the bank was $100,000. The Edwards (defendant's) family had long directed its affairs. Two sisters, one of whom was the defendant, and a brother owned a majority of the stock. The brother had been a director since 1922 and president since 1927. Defendant's husband had been a director since 1927, and at one time was its vice-president. He received from his wife the stock which qualified him to act as a director. Defendant was, and her husband was probably not, financially responsible in September, 1931.

The husband and defendant's brother were fully cognizant of the bank's condition, of a condition growing daily worse, of its borrowing large sums to meet withdrawals of depositors, of the steady decline in the value of its securities. A few days before defendant transferred her stock to her husband, a national bank examiner had examined the bank, called the directors together (including defendant's husband), and made a dismal, discouraging report. He demanded vigorous and immediate restorative steps which the stockholders could not take.

There had been a depreciation of $191,000 in the bank's securities within the year. A thorough analysis of the bank's portfolio was made and the weaknesses of each security pointed out. The investment portfolio was pitifully weak. The total of all bond holdings was approximately, $750,000. Of this amount $260,000 was invested in second grade railroad bonds, only a few of which had better than a B-2 rating. There were $37,000 of Chicago Street Railway bonds which were in default and another $20,000 in Chicago Rapid Transit Company. Approximately $75,000 foreign bonds were

* Sec. 64. " * * * The stockholders in any national banking association who shall have transferred their shares or registered the transfer thereof within sixty days next before the date of the failure of such association to meet its obligations, *or with knowledge of such impending failure,* shall be liable to the same extent as if they had made no such transfer, to the extent that the subsequent transferee fails to meet such liability; * * *."

in the portfolio, not one of which had as high as a B-2 rating. Most of them were German and South American issues. Both they and the railroad and the Chicago Street Railway bonds could never have been called proper bank investments—all weak and sinking.

Among the industrials which aggregated $200,000, there appeared $23,000 International Match, $10,000 Van Sweringen, and $10,000 Krueger & Toll. $10,000 of the State of Coahuila, Mexico, rating and value unknown, closes the list.

Probably the true explanation of the class of bonds on hand is to be found in the fact that interest on time certificates was three percent. for six months, four percent. for one year. Only securities paying high interest rates were sought, because of the rates paid on deposits. Security was sacrificed for interest yield.

The bank examiner's values were extremely liberal, yet his report showed all the surplus of the bank wiped out and 90% of the bank stock depreciated. This depreciation existed without considering some $200,000 of local loans, each of which was analyzed in the report and showed a condition typical of the years 1931 and 1932. They were described in many cases as "over due," "slow," "doubtful," or a "loss." The examiner demanded contributions from the stockholders and the elimination of much paper.

The bank's president immediately made a trip to Washington to see the Comptroller, who consented to let matters "ride." This was about September 1, 1931.

About the same time (Sept. 1, 1931) defendant caused the withdrawal of her children's and her maid's deposits, $2100 and $2500, respectively, although each had less than a month to run to entitle the holder to six months' interest. The day after the transfer, her husband and her brother went to South Bend to confer with the bank examiners in reference to the bank's condition.

When the bank opened on a restricted basis in April, 1933, the old and new accounts were kept separate. Ultimately five cents on the dollar were paid to the old depositors. The defendant reduced her personal deposits during the summer of 1931.

The husband at the time he gave his unsecured note to his wife for the stock was embarrassed financially. The most substantial item of his asset statement consisted of stock in the Miami Manufacturing Company and a sum which that company owed him. Outside of these two items the value of all his assets, including cash surrender value of life insurance policies, was less than $1500.

The par value of the stock of this company, of which the husband was president, was $210,000. This, however, had been depreciated by $190,000, leaving apparent worth to the stock of $19,000. The husband owned 543 shares. The total loss that year was $19,628. Its business outlook was typical of all such manufacturing companies in 1931 and 1932—black without a star lighting the horizon. This company owed the bank $14,000 and the husband was the sole endorser of this note.

The president stated that in his opinion the bank was insolvent in 1931. The husband, discussing the possibilities of a stockholder's double assessment, said to his brother-in-law, the bank's president, "I have done the best I could to protect Clara, and I would be in the clear myself if Guy York had not been so slow." Guy York was a local attorney.

The foregoing briefly states the facts upon which the plaintiff relied. It does not, however, tell all of the story. It does not give defendant's explanations.

Because we are not passing upon the question of fact as the trier thereof, but merely determining whether a jury question was presented, defendant's explanation might well be omitted, but briefly we supplement the foregoing to afford a background for her assertion that she was ignorant of the bank's condition when she sold her stock to her husband.

She testified she was unaware of the condition of the bank; that she directed her husband to ascertain the value of the stock and report to her; that he did so; that she believed the bank was a safe, sound, well and conservatively operated banking institution; that it was managed by her brother in whom she justifiably had faith and confidence and that in her opinion the bank was solvent. She explains her large bank withdrawals on the theory that she wanted to invest the money in securities paying higher interest rates. The same applies to her withdrawing her maid's and children's money from the bank, but she gives no explanation as to why she did not wait another month so as to get six months' interest on the time certificates. She said she left the management of a trust of consider-

able size in which she was interested to her husband and she accepted his estimate of the value of the bank stock and let him fix the terms of the note he gave her therefor, as a matter of habit, and as an expression of confidence in her husband, whose standing and reputation justified such confidence.

We are left without doubt as to the error which the court committed in not submitting the issue of defendant's knowledge to the jury.

The following inescapable facts are impelling.

The stock was transferred by the wife to her husband.

The wife was financially responsible. Her husband was not.

No consideration therefor passed except an unsecured note of her husband, upon which no sums were paid until after the bank failed. No explanation is offered as to why the husband, already insolvent, should go in debt $29,000 to purchase bank stock in the fall of 1931 when bank stock was generally unsalable because of the imminency of stockholder's double liability. Banks were crashing in increasing number. No person of business sagacity was buying bank stock.

The examiner showed a bank condition which even the inexperienced knew was desperate, if not hopeless.

The withdrawal of money from the bank by the defendant for herself, as well as for her two children and her maid, is more consistent with business sagacity and foresight than with ignorance of the bank's condition.

The husband's frank admission that he did all he could to protect his wife, meaning—against a stockholder's double liability, leaves his action and intention clear and fully explained. Her request that he investigate and report to her the value of the bank's stock made him her agent, and his knowledge was her knowledge.

In a case with such a fact background, defendant's statement that she knew nothing of the condition of the bank is not conclusive. A state of mind respecting knowledge is as much a fact issue as the state of one's appetite or his digestion. One's assertion does not weigh heavily against the undisputed facts to the contrary. A jury should consider all the testimony, but it is not bound to accept a protestation of innocence if well established facts dispute it.

Persuaded, as we are, that the court erred in not submitting the fact issue to the jury, the judgment must be and is hereby reversed with directions to grant a new trial.