## STEBER v. KOHN et al.

### No. 8683.

Circuit Court of Appeals, Seventh Circuit.
April 18, 1945.

Rehearing Denied June 4, 1945.

Earl J. Walker, of Chicago, Ill., for appellant.

Maurice S. Cayne and Bernard W. Vinissky, both of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

The plaintiff appeals from a judgment in favor of defendants on a directed verdict entered at the close of her evidence. The action was brought to recover for damages for serious and permanent illness alleged to have resulted from poisoning caused by wearing a pair of shoes which had been dyed with a product alleged to have been manufactured and sold by defendants.

Appellees have moved to dismiss this appeal on the ground that it was filed too late to confer jurisdiction on this court to hear it. The facts as to this are that the judgment was entered on February 1, 1944. Motion for new trial was seasonably filed, and thereafter, on March 2, overruled. On April 28, appellant filed a second motion for new trial on the ground of newly discovered evidence, with supporting affidavits. Leave to file this motion was duly granted; the court took it under advisement, and, on June 9, overruled it. Notice of appeal was filed on August 11. Appellees contend

that the filing of the motion for new trial on the ground of newly discovered evidence did not operate to extend time for taking the appeal which started running with the denial of the first motion for new trial, citing Gersing v. Chafitz, 77 U.S.App.D.C. 38, 133 F.2d 384; Dante v. Bagby, 39 App. D.C. 516; Jusino v. Morales & Tio, 1 Cir., 139 F.2d 946. We do not agree. It is clear that the motion for new trial for newly discovered evidence was properly filed under the provision of Rule 59(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which permits the filing of such motion at any time before expiration of the time for appeal, with leave of court obtained on notice and hearing and on a showing of due diligence. We see no reason for differentiating between the effect of this motion and the one involved in Leishman v. Associated Wholesale Electric Co., 318 U.S. 203, 63 S.Ct. 543, 544, 87 L.Ed. 714. There the Court held that a motion under Rule 52(b) of the Federal Rules of Civil Procedure to amend and supplement the findings in a patent infringement suit "deprived the judgment of that finality which is essential to appealability." It stated the general rule that "where a petition for rehearing, a motion for a new trial, or a motion to vacate, amend or modify a judgment is seasonably made and entertained, the time for appeal does not begin to run until the disposition of the motion." We think this rule is equally applicable here. The court granted leave to file the motion for new trial for newly discovered evidence, and took it under advisement. Granting of the motion would have required vacating the judgment, hence until disposition of it, the judgment which it sought to set aside could not become final and appealable. Time for the appeal did not, therefore, begin to run until denial of the motion, and the appeal was timely taken.

The motion for directed verdict did not state grounds therefor, as required by Rule 50(a) of the Federal Rules of Civil Procedure. However, in granting it, the court made the following statement:

"I have considered this evidence very carefully, what came in yesterday, and what I heard this morning, I reviewed my notes here over the noon hour, and some of the depositions, and, without meaning in any way to reflect upon counsel, I really do not think that this plaintiff, in her unfortunate condition, should be forced to go through any more, because, although it may well be that the opinion of her doctor is correct that her present condition is traceable to her having taken into her system in some way or other one of these benzine derivatives, and even assuming his conclusion that it was in the shoe dye is correct, I certainly think the plaintiff has wholly failed to prove that it was the product of the defendant here.

"To permit you to go further, and to require the defendant to put in his case, if the jury returned a verdict in your favor, which would probably be doubtful under proper instructions, I would, in conscience, have to set it aside.

"I think this evidence should have been analyzed before this unfortunate girl had to go to the expense that she did in trying to effect a recovery. Probably some shoe dye manufacturer is responsible, I don't know. Clearly you have not proved this defendant responsible.

"Here we have a cobbler in the city in which this girl resides * * * who by his own testimony, admits he has used several shoe dyes, that whatever he bought of the products of the defendant in this case he bought from this Joe Lieberman, who delivered it to him on a truck, and his testimony is that he delivered about 25 per cent of the products that this shoemaker used, that he bought 75 per cent of his material from other jobbers selling shoemakers' supplies.

"He also testified that never on his truck has he carried any gallon lots of defendant's products, yet the testimony is that the dye used in this case—if he in fact dyed this plaintiff's shoes, and we have only her word for it, he doesn't remember doing it—came from gallon bottles.

"We have the testimony of Lieberman that it would have been possible, of course, for him to have ordered it direct, as Mr. Lieberman states, by mail or otherwise, from the store or company, and have it delivered independently of Lieberman, but there seems to be no record of that. Then we have this company that Lieberman works for, handling some twelve or fifteen other kinds of shoe dye.

"I fail to see where the product of this defendant has been put sufficiently clearly into the picture to make this defendant respond in damages as against any other manufacturer of shoe dye whose name this cobbler and Joe Lieberman may have thought of when asked some two years lat-

er, 'Whose shoe dye did you put on somebody's shoe?' There is clearly no connection.

"In a case of implied warranty, you must have certain clear and convincing evidence that the product as to which the warranty is alleged to have been made actually found its way into the body of the plaintiff, and that the plaintiff's condition of which she complains was caused by its getting there. We do not have any such proof in this case.

"I think the plaintiff has wholly failed to establish the issues that it is her burden to establish. I feel sympathy for her. I would like to help her. Under the law I cannot. I can do nothing but direct a verdict for the defendant, which is accordingly directed at this time."

■ We have set forth in full the statement of the court explaining its action in order that we may have it as a background for our examination of the evidence introduced by plaintiff, and in determining whether or not the court erred in holding as a matter of law that there was no substantial evidence to support the plaintiff's action. It is, of course, axiomatic that the court, in ruling on a motion for directed verdict, must give full credence to all the evidence offered by the party against whom the verdict is sought. Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458. In Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 233, 74 L.Ed. 720, the Court said, "Issues that depend on the credibility of witnesses, and the effect or weight of evidence are to be decided by the jury. And in determining a motion of either party for a peremptory instruction, the court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish and that from such facts there should be drawn in favor of the latter all the inferences that fairly are deducible from them."

Plaintiff herself testified that on October 21, 1940, she took a pair of white leather shoes to a cobbler, Fred Pannucci, to have them dyed black. She got the shoes back on October 23, and wore them for the first time after they were dyed, on October 26, for about three hours. When she took them off she noticed a red mark on her left foot and also that her stockings were discolored. Two days later large spots started to form around the spot on her foot, and from that the rash spread until it covered her entire body. She consulted a physician on November 3, and after seeing him three times, and taking the medicine he prescribed for her, she consulted a second physician who also prescribed for her and then referred her to Dr. Coombs under whose direction she entered a hospital on November 28. Prior to October 1940, her health had been very good.

Dr. Coombs attended plaintiff from November 28, 1940, until he entered military service in September 1942. The record shows that he was exceptionally well qualified in his specialty, biochemistry, and had had experience in treating several cases of shoe dye poisoning. He testified to the serious and permanent nature of her illness which he diagnosed as purpura which later developed into Bright's disease or nephritis, and secondary anemia. He also stated that she would require medical treatment for the rest of her life, but that it would be a losing process and that her prognosis was guarded or bad. He also testified as to the poisonous effects of the benzene products on the human body, naming various benzene derivatives which are easily absorbed in the body through the skin, including orthodichlorobenzene, a highly poisonous compound, one part in 100,000 being enough to be poisonous. He stated that the cause of her condition was the absorption of poison in her body. He also stated that in his opinion, she had been poisoned by shoe dye, but that answer was stricken. He was allowed to say that the poison was typical of benzene or one of its compounds and that in his opinion a shoe dye containing orthodichlorobenzene as a solvent was not reasonably safe to use in dying shoes, and that the presence of benzene and many of its derivatives, including orthodichlorobenzene, in a shoe dye used in dyeing the shoes worn by a young woman could be a competent producing cause of purpura, anemia or Bright's Disease.

The testimony of the cobbler, Fred Pannucci, was introduced by deposition taken October 30, 1943. The record shows that this witness was an Italian, 45 years old, who could not read or write English, and that he had been in the shoemaking business since he was ten years old. He did not remember dyeing plaintiff's shoes. With reference to the dye he was using during the month of October 1940, he stated that he did not remember the name but that he recalled that Jaffee sold it to him through a

salesman, Joe. We quote his exact evidence as to this:

"Q. Do you know the kind of dye that this Joe was selling at that time you bought? A. Sure, I know the kind.

"Q. What kind was it? A. I don't remember the name, I will see, I know the kind, I don't remember the name.

"Q. Do you have anything in your possession, either in your store or here with you, that gives the name of the dye you were using at that time? A. You got it, Mr. Bauknecht (his own attorney).

"Q. You turned it over to Mr. Bauknecht? A. Yes, sir; I don't remember the name.

"Q. Does the thing you turned over to Mr. Bauknecht have the name of the dye? A. Just the name.

\* \* \* \* \* \* \*

"Q. Mr. Pannucci, handing you this package which we will call Plaintiff's Exhibit 1, is this what you had in mind in answer to the last question? A. Yes, this is it.

\* \* \* \* \* \* \*

"Q. How did you get that? A. I asked Joe Brown to give me the address, same kind, the address, to give me this. This is the address.

"Q. Joe, you are mentioning, is the man who sold you that dye that was used? A. Yes.

"Q. During the month of October, 1940? A. Yes.

"Q. You asked him for the address? A. That address, he give me this bottle.

\* \* \* \* \* \* \*

"Q. Does this recall to your attention the type of dye you were using in 1940? A. Yes.

"Q. And was it the same kind of dye? A. Yes.

"Q. What type of containers did you have, did you carry this dye in? A. What do you mean?

"Q. What kind of container \* \* \* what sized container was the dye in you used in October, 1940? A. One gallon.

"Q. And that was sold to you by Joe? A. Joe sold it to me.

"Q. Do you still have the container? A. No. \* \* \* I throw it away \* \* \*"

The package referred to, Exhibit 1, contained a small glass bottle with a distinctive label bearing the name "Shur-Dye" spelled in white and yellow on a black background with yellow border lines and a yellow space with the words "Non-toxic leather dye," and the name and address of the manufacturer "Shur-Gloss Mfg. Co., Chicago, U. S. A."

Pannucci further testified, on cross-examination, that he had used other dyes than Shur-Dye, but that he never mixed them, and:

"Q. It was necessary, Mr. Pannucci, for you to furnish Mr. Cooper with the name of the dye you were using in 1940 to send, to ask Joe to get you a bottle of dye, wasn't it? A. Yes, the same kind.

"Q. You asked Joe to get you a kind of dye? A. Yes.

"Q. It was because of the fact that you were sent a bottle of dye with the name Shur Leather Dye, with the name Shur Gloss Manufacturing Company of Chicago on there, that you concluded that the dye you used in 1940 was Shur Dye?

"Mr. Cooper: I object.

"A. Yes.

"Q. And, independently, of the package, Plaintiff's Exhibit 1, you don't know what dye you used? A. When?

"Q. In 1940? A. That kind of dye there.

\* \* \* \* \* \* \*

"Q. Then outside of the reference to this Plaintiff's Exhibit 1, being the package of dye you got from Joe, you didn't remember the name of the company? A. I still don't remember it, I see it there. \* \* \*"

On redirect examination Pannucci testified further:

"Q. I want to ask you a couple more questions; the first time I came to see you did you or did you not give me an address? A. Yes, I gave address from the gallon I remember.

"Q. And was the address you gave me of your own personal knowledge the same address that appears on that carton? A. I think so.

"Q. At that time in October, 1940, or just a short time before that were you buying all of your dye from Joe? A. No, buy it from—depends, sometime I short, I buy from Joe, sometimes, depend on when I would be short.

"Q. The dye you had in the gallon container is dye you would buy from Joe? A. Joe.

"Q. And was it a short time after that you asked Joe to send you this box? A. In a short time because throw away the gallon because I give the address, I give it to you and other fellow, no use keeping the gallon, I throw it away. After that the paper come and I asked Joe that address, the gallon, the dye, to sell it to me."

The Chief of Police of East Palestine testified by deposition that in October 1940, or shortly thereafter, at the request of plaintiff's father, he went to Pannucci's shop and got a sample of shoe dye from him which, he said, Pannucci took from a gallon glass jug and put in a small tin can and which he then gave to Mr. Steber within a few minutes, without change. Mr. Steber testified that he took the can home, got his car, and took it to a chemist, Mr. McBride, without change. McBride testified, also by deposition, that Mr. Steber brought him a sample of black shoe dye for analysis and that he submitted his report on January 23, 1941, probably within three days after receiving the sample. He stated that, as he recalled, the sample was submitted in a small glass bottle, about a four ounce one, and that most of it had been used, the remainder was evaporated so that it was hardly a liquid, there being very little of it left in the bottle, and that little not enough for a quantitative analysis—"the sample present would not accurately represent the proportions of solvent and pigment which were originally present." He tested the sample for nitrobenzol with positive results, and also found aniline colors and benzaldehyde present.

One of the defendants, A. R. Kohn, testified that he and his brother did business as a co-partnership, and had been manufacturing shoe dyes since 1910, and that ortho-dichlorobenzene was one of the ingredients used in the black dye. He was not asked the formula.

Jaffee, a dealer in leather and shoemaker supplies, and his salesman, Joe Lieberman (referred to by Pannucci as Joe Brown) both testified by deposition. Jaffee stated that he handled Shur-Dye in its original containers, small bottles and quarts, but could not remember whether or not he handled the gallon size during the year 1940. No change was made in the labelling or packaging of the products in his shop. Shur-Dye was the only product of defendants that he handled, and he thought he had done business with Pannucci during the year 1940, although he had not looked to see whether or not he had a record of such business. He also handled fourteen other varieties of shoe dye.

Lieberman testified that he sold the Jaffee supplies from a truck and he had carried Shur Gloss dye but only in small packages, never the gallon size. He had been selling to Pannucci since he went into business but could not recall selling him any Shur Gloss dye during 1940 and had no records to show it. He stated that Pannucci bought twenty or twenty-five per cent of his supplies from him, and that he might have written direct to Jaffee for supplies he did not carry on the truck; he had customers who used dye, Shur Gloss or otherwise, in gallon quantities, and customers might order directly from Jaffee.

Of course, the principal question here presented is whether or not the court erred in directing the verdict at the close of plaintiff's evidence. The test as to this question was well stated by Judge Evans in Flynn v. Crume, 7 Cir., 101 F.2d 661, 662, "If the record discloses substantial evidence from which reasonable men might find the material, controverted issues in favor of the plaintiff, it is improper to direct a verdict for the defendant. Ordinarily only the evidence most favorable to the party against whom the motion is granted, need be examined. Otherwise the court might assume a fact which the jury would find, upon disputed evidence, to be otherwise."

We think the court was not guided by the proper standards in passing on the motion for directed verdict. Instead of resolving all doubts in favor of the plaintiff, it appears to have resolved them against her, even creating some which were not present on this record. We note its statement, questioning whether Pannucci even dyed the shoes, "we have only her word for it," and as to whether shoe dye could have been responsible for her condition "even assuming his (the physician's) conclusion that it was in the shoe dye is correct." With respect to the identification of the particular dye used, the court seems to have completely disregarded the positive evidence of Pannucci that he bought it through Joe from Jaffee, and that he was able to identify it from a small bottle bear-

ing a certain distinctive label which was the same as he was using in October 1940. The court apparently was much more impressed by the evidence of Lieberman who said he could not recall selling Pannucci any Shur Gloss dye during 1940 and never carried gallon containers on his truck. Here was clearly a dispute of fact which should have been submitted to the jury. From the fact that it was Joe himself who furnished the small bottle when called upon in 1942 to furnish the name and address of the manufacturer of the dye, the jury might have inferred that at that time he was convinced that that was the dye furnished, and that his evidence on deposition in 1943 represented a change in position.

Appellant cites substantial and persuasive authority in support of her proposition that she was entitled to recover from the defendants as manufacturers of a dangerous product.[1] In view of the fact that appellees do not discuss this issue, merely contending that the authorities are not material to the case and not applicable unless it is first determined whether there was competent and substantial evidence to warrant submission of the case to the jury, we do not consider it necessary to discuss the matter beyond saying that under the authorities it seems clear that absence of privity is no bar to plaintiff's recovery from the manufacturer of the product responsible for her condition. See Elizabeth Arden, Inc. v. Brown, 3 Cir., 107 F.2d 938.

We are convinced that the court erred in granting defendants' motion for directed verdict at the close of plaintiff's evidence.

Appellant also assails the action of the court in denying her motion for new trial on the ground of newly discovered evidence. Since we are convinced that the court's action in directing the verdict was erroneous, it is unnecessary for us to discuss this issue.

Judgment reversed and cause remanded for new trial.

[1] Ultramares Corp. v. Touche, 255 N. Y. 170, 174 N.E. 441, 74 A.L.R. 1139; Shearman and Redfield on Negligence (Rev.Ed.), Vol. 4, § 3654; Restatement, Torts, § 395; Johnson v. Cadillac Motor Car Co., 2 Cir., 261 F. 878, 8 A. L.R. 1023; Waters-Pierce Oil Co. v. Deselms, 212 U.S. 159, 29 S.Ct. 270, 53 L.Ed. 453; Grant v. Australian Knitting Mills, 105 A.L.R. 1483; Sicard v. Kremer, 133 Ohio St. 291, 13 N.E.2d 250; Gerkin v. Brown & Sehler Co., 177 Mich. 45, 143 N.W. 48, 48 L.R.A.,N.S., 224; Petzold v. Roux Laboratories, 256 App. Div. 1096, 11 N.Y.S.2d 565; Cahill v. Inecto, Inc., 208 App.Div. 191, 203 N. Y.S. 1; Noone v. Perlberg, Inc., 49 N. Y.S.2d 460; Farley v. Edward E. Tower Co., 271 Mass. 230, 171 N.E. 639, 86 A. L.R. 941; Gilbride v. James Leffel & Co., Ohio App., 47 N.E.2d 1015; White Sewing Machine Co. v. Feisel, 28 Ohio App. 152, 162 N.E. 633; Kreger v. George W. Diener Mfg. Co., 321 Ill.App. 302, 53 N.E.2d 26; Colbert v. Holland Furnace Co., 333 Ill. 78, 164 N.E. 162, 60 A.L. R. 353.