**STUEBER et al. v. ADMIRAL CORPORATION.**

No. 9658.

United States Court of Appeals
Seventh Circuit.

Jan. 5, 1949.

Rehearing Denied Feb. 3, 1949.

Ferris E. Hurd and John R. Whitman, both of Chicago, Ill. (Pope & Ballard, of Chicago, Ill., of counsel), for appellant.

Julius L. Sherwin and Theodore R. Sherwin, both of Chicago, Ill., for appellees.

Before KERNER, and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Defendant appeals from two judgments rendered upon the verdicts of a jury in a consolidated action, wherein the two plaintiffs sued for malicious prosecution. Defendant questions the propriety of the action of the District Court in, (1), denying its motion for a directed verdict, (2), admitting evidence, (3), excluding other evidence, (4), giving certain instructions and, (5), refusing to charge the jury in accord with its requested instructions.

On May 1, 1946, defendant's warehouse, wherein were stored radios, radio parts and other equipment, was burglarized and some $19,000 worth of merchandise stolen. This included more than 3,000 radio loud speakers; over 1,000 "Admiral Life-Time" Phonograph needle cards, on which were mounted a total of 12,792 needles; and some 586,000 feet of yellow wire. The speakers bore a number, "78 B 7," identifying them as having been manufactured expressly for defendant. Defendant did not ordinarily sell these as separate articles but placed them in completely assembled radios distributed to the trade. The needle cards carried the Admiral trade-mark and were usually sold in small lots. The regular wholesale price to dealers was $1.25 per needle, or $15 per card.

Plaintiffs were partners in a wholesale business known as "Chicago Radio Parts Supply," located in the basement of 5327 West North Avenue, Chicago, under a retail and repair shop run by Robert Stueber called "Bob's Radio and Appliance Sales and Service." Plaintiff James Stueber also conducted another business under the name of "Radio Electric Laboratories" at another location. James knew Miles Svoboda and his brother Jerry, who operated a radio retail and repair shop, under the name of "West Town Sound" at 5920 West Cermak Road, Cicero. Plaintiffs had never bought anything from the Svobodas but the latter had been customers of plaintiffs. The Svobodas were not engaged in wholesale business.

In June, 1946, James Stueber, while in the Svoboda shop, was shown a needle card, bearing the word "Admiral" and a speaker. Svoboda told James that these were samples of distress merchandise which could be purchased at abnormally low prices. To James' inquiry as to why he could not deal directly with the party who owned the merchandise, Svoboda replied that the owner was a rough character with whom it was very difficult to deal. Eventually James bought from the Svobodas some 1,200 needles (100 cards) and 700 speakers, paying less than half the wholesale price. For the first lot of merchandise he paid $500 in cash; for the second, he gave a check for $506 payable to cash. Thereupon James caused the needle cards and speakers which he had purchased to be moved to and stored in the storeroom of himself and his brother and they began selling the merchandise in their wholesale business. The speakers, purchased at 75¢, were sold at from $1.25 to $2.65 each and the needles, purchased at 50¢ each, were sold for $1.

Defendant had promptly reported the May 1st burglary and the Chicago police had persistently attempted to locate the stolen merchandise. What they learned eventually led them to plaintiffs' place of business on September 21, 1946. At that time plaintiffs told the officers that they had been advised some few days prior thereto that the property they had might be stolen goods. At the trial, Robert said that he had previously heard of the Admiral burglary and of the theft of some $19,000 worth of merchandise. When they

learned that the merchandise he and his brother had bought might be a part of the stolen property, he said that he and James discussed what could be "done with it," if it was "hot," what they should do with it and whether they should report it to the police or hide it. However, they took no steps at any time before their arrest to make known to any one their possession of the questionable property.

Plaintiffs were lodged in jail on Saturday, September 21, and remained there, under conditions which we shall discuss later, until the following Monday, when the police for the first time informed defendant that they had been apprehended and were suspected of being guilty of the crime of receiving stolen property. On that morning, September 23, the police showed Heinrich, defendant's representative, the needle cards and speakers found in the possession of plaintiffs. Heinrich saw 109 cards bearing defendant's name "Admiral." He identified the speakers by defendant's special number, 78 B 7. He was then asked to sign complaints, but refused to do so until he had returned to defendant's office and consulted with his superior officers. After doing this, the complaints having been written by the police in the meantime, Heinrich returned to the police station and signed them, charging plaintiffs with having received stolen property. Heinrich testified that he received "certain information" from the police but he did not disclose just what he had been told; the record is wholly silent as to just what information he had received from any source or upon what he had relied. Plaintiffs were immediately released on bond and, later, in the Municipal Court the charge against each of them was dismissed. Thereafter each filed suit and the two causes of action were consolidated for trial.

It is clear that plaintiffs, in order to succeed, were bound to show by the preponderance of the evidence that defendant had caused them to be prosecuted without any probable cause and with malice. Stated otherwise if defendant had "reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the accused was guilty of the offense charged," probable cause existed. Knickerbocker Ice Co. v. Scott, 76 Ill.App. 645 at page 647; Harpham v. Whitney, 77 Ill. 32 at page 39; Jacks v. Stimpson, 13 Ill. 701, 702. Where there is evidence both pro and con, obviously the question becomes one of fact which must be submitted to the jury. Before we can say the trial court erred in failing to direct a verdict for defendant, the record must reflect clear error in the holding that the evidence was sufficient to go to the jury. It is our duty to accept as true all the facts which the plaintiffs' evidence tends to prove and to draw against the proponent of the motion all reasonable inferences most favorable to the respondent. If the evidence is of such character that reasonable men, in an impartial exercise of their judgment, may reach different conclusions, the case must be submitted to the jury. Worcester v. Pure Torpedo Co., 7 Cir., 140 F.2d 358, 359; Steber v. Kohn, 7 Cir., 149 F.2d 4, 6. At the time the warrants were issued neither defendant nor its representatives knew the plaintiffs. Heinrich identified the goods as those of defendant. But, so far as this record discloses, he knew only that the goods had been picked up in plaintiffs' shop. Whether all the facts and circumstances in evidence proved presence or lack of probable cause, we think, was for the jury. The court properly denied the motion for a directed verdict.

The court received evidence of plaintiffs' alleged mistreatment by the police during the two days when they were in custody, before defendant was advised of their detention and caused the complaints to issue. Plaintiffs testified that the police officers placed them in separate cells, where they had no facilities for sleeping or bathing and no toilet; that they were later removed to another room and questioned, and then to other cells. According to Robert, he was imprisoned some three or four hours with a number of other prisoners. The later confinement places were, they said, "much filthier" than the ones in which they were first lodged. Finally Robert was moved to a large cell, in which were "several drunken people" who "looked like bums" and "like they were infested with all types of vermin." Their pictures were taken with the

Svobodas, and they were put through "show-ups" under flood lights. The coffee was not "fit to drink"; thy were offered bread and bologna sausage "of which even the smell nauseated" them. These and other revolting details of alleged mistreatment were received in evidence.

■ Defendant had in no way participated in or in any manner been responsible for the actions of the police. Prior to Monday morning, September 23, when defendant's attention was first called to the matter, it had no knowledge that an arrest had been made or was even contemplated. It did nothing to initiate or inspire what happened in the two preceding days. The police officers derived their authority solely from the state, of which, when they performed their functions, they were agents; they were not acting as agents or employees of defendant. As said in Chesapeake & Potomac Telephone Co. v. Lewis, 69 App.D.C. 191, 99 F.2d 424, at page 425: "Mere information to the officers of the law by a citizen, tending to show that an offense has been committed and that some person named may be suspected of its commission, is not sufficient, of itself, to warrant the inference that the informer or his agents participated in the unlawful arrest and imprisonment of the accused by the officer."

■ It can not be questioned, we think, that this evidence was most prejudicial to defendant. The court denied a motion to strike it. We think the motion should have been allowed.

■ True, the court charged the jury that if they found for plaintiffs then in determining the damages, they should exclude such damages as might have been suffered by plaintiffs as a result of illegal acts. To one skilled in the law this would probably mean that the court had in mind the acts of the police during their detention of plaintiffs prior to the issuance of the complaint. But we do not think the charge sufficient to advise the jury that defendant was not to be charged with anything done by the police prior to the issuance of the complaints. All of the prejudicial evidence as to what occurred before the defendant was called in and asked to sign the complaint, remained in the record and, as we have said, it could only prejudice the jury. To eliminate the prejudicial effect of this testimony, it was necessary that the court charge the jury that the acts of the police could in no wise be considered not only in fixing damages but also in determining whether plaintiffs were guilty of malicious prosecution, that is, whether defendant had reasonable cause to believe that plaintiffs were guilty or without such cause, maliciously caused plaintiffs to be prosecuted. In other words the charge did not remedy the error innate in the refusal to exclude prejudicial testimony.

Defendant contends that the court unduly limited defendant's cross-examination of plaintiffs. Objections to counsel's questions, propounded to each plaintiff, as to what they told police officers were sustained. The evidence sought to be elicited had already been received, in so far as James Stueber was concerned, and the record discloses that the question was eventually put to Robert.

■ Defendant offered certain instructions having to do with the essentials of a cause of action for malicious prosecution. We think the court adequately covered this subject matter in its charge. But, irrespective of the merit of defendant's contention in this respect, defendant is in no position to complain. Failure of the court to give requested charges must be properly objected to before it may be made the basis for a reversal. By its failure to object defendant is precluded from questioning the correctness of the ruling. Dommer v. Pennsylvania R. Co., 7 Cir., 156 F.2d 716; McVeigh v. McGurren, 7 Cir., 117 F.2d 672, 680; Reeve Bros. v. Guest, 5 Cir., 131 F.2d 710. Rule 51 of Federal Civil Rules of Procedure, 28 U.S.C.A. This rule applies with equal force to charges given; failure to object thereto is equally fatal. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719; Greer v. Shell Petroleum Corp., 281 Ill.App. 238.

■ Defendant criticizes certain portions of the charge because they advise the jury that malice may be inferred from want of probable cause. We think the charge was not erroneous. As we said in Sheffield v. Cantwell, 7 Cir., 101 F.2d 351,

352: "The existence of malice does not tend to prove a want of probable cause, for although malice may be inferred from lack of probable cause, the absence of probable cause cannot be inferred from malice. McElroy v. Catholic Press Co., 254 Ill. 290, 294, 98 N.E. 527; Brown v. Smith, 83 Ill. 291."

Summarizing, we hold that the court erred in failing to exclude prejudicial evidence. The judgment must be and is reversed for a new trial.